ZURI–INVEST AG, Plaintiff,

v.

NATWEST FINANCE INC. f/k/a Gleacher NatWest Inc.; NatWest Capital Markets Limited; National Westminster Bank PLC; McDonald Investments Inc. f/k/a McDonald & Company Securities, Inc.; and Steel Dynamics Inc., Defendants.

No. 00 7963.

United States District Court, S.D. New York.

Oct. 26, 2001.

James R. Safley, Esq., Thomas B. Hatch, Esq., Randall Tietjen, Esq., Robins, Kaplan, Miller & Ciresi LLP, Minneapolis, MN, David G. Glasser, Esq., Levin & Glasser, P.C., New York, for Plaintiff.

Frank C. Razzano, Esq., Adam Proujanksy, Esq., Benjamin R. Ogletree, Esq., Dickstein Shapiro Morin & Oshinsky LLP, Washington, D.C., for Defendants.

---

## OPINION AND ORDER

SCHEINDLIN, District Judge.

NatWest Finance Inc., NatWest Capital Markets Limited and National Westminster Bank (collectively "defendants" or "NatWest") now move for entry of partial summary judgment dismissing Count III of plaintiff's Amended Complaint.[1] Count III asserts state common law claims of fraud, conspiracy to commit fraud, and aiding and abetting fraud. Defendants contend that these claims have been preempted by the National Securities Markets Improvement Act of 1996 ("NSMIA"), Pub.L. No. 104–290, 110 Stat. 3416 (1996), codified in part at 15 U.S.C. § 77r. For the reasons set forth below, defendants' motion is denied.

---

**1.** Plaintiff recently settled its claims with the remaining defendants, McDonald Investments Inc. and Steel Dynamics Inc.

## I. BACKGROUND

The present case is nearly identical to a related action pending before this Court, *Gabriel Capital, L.P. v. NatWest Finance Inc.*, No. 99 Civ. 10488(SAS), which contains the same common law fraud claims asserted by Zuri–Invest AG ("Zuri"). Both cases have the same underlying facts which have been exhaustively summarized by this Court in two prior Opinions. *See Gabriel Capital, L.P. v. NatWest Finance, Inc.*, 94 F.Supp.2d 491, 512 (S.D.N.Y.2000) and *Gabriel Capital, L.P. v. NatWest Finance, Inc.*, 122 F.Supp.2d 407, 437 (S.D.N.Y.2000). Familiarity with these Opinions is assumed for purposes of this motion.

## II. DISCUSSION

### A. Preemption—General Concepts

The Supremacy Clause of the Constitution provides that the laws of the United States "shall be the supreme Law of the Land; ... any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." U.S. CONST. Art. VI, cl. 2. Federal law displaces state law where: (1) Congress expressly preempts state law; (2) Congress has established a comprehensive regulatory scheme in the area effectively removing the entire field from the state realm; or (3) state law directly conflicts with federal law or interferes with the achievement of federal objectives. *See English v. General Elec. Co.*, 496 U.S. 72, 78–79, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990); *see also Lady v. Neal Glaser Marine, Inc.*, 228 F.3d 598, 601 (5th Cir.2000), *cert. denied*, —— U.S. ——, 121 S.Ct. 1402, 149 L.Ed.2d 345 (2001); *Bedford Affiliates v. Sills*, 156 F.3d 416, 426 (2d Cir.1998). However, there is

a presumption against preemption. "In the interest of avoiding unintended encroachment on the authority of the States . . . a court interpreting a federal statute pertaining to a subject traditionally governed by state law will be reluctant to find pre-emption." *CSX Transp., Inc. v. Easterwood,* 507 U.S. 658, 663–64, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993). The presumption that federal law does not preempt a state's police powers may be overcome only upon showing that preemption was the " 'clear and manifest purpose of Congress.' " *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996) (quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947)); *see also Cipollone v. Liggett Group Inc.,* 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992).

▮ Federal statutes preempt state law where the statute contains explicit preemption language. *See Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 95–96, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983). Alternatively, preemption can be implied. "Implied preemption exists when (1) state law regulates conduct in a field Congress intended the federal government to occupy exclusively [implied field preemption], or when state law actually conflicts with federal law [implied conflict preemption]." *Choate v. Champion Home Builders Co.,* 222 F.3d 788, 795 (10th Cir.2000); *see also English,* 496 U.S. at 79, 110 S.Ct. 2270.

## B. Express Preemption

▮ Whether the NSMIA expressly preempts plaintiff's state law claims depends on how the statute is interpreted. *See CSX Transport.,* 507 U.S. at 664, 113 S.Ct. 1732 ("If the statute contains an express pre-emption clause, the task of statu-tory constructions must in the first instance focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent."). Congressional purpose is the "ultimate touchstone" governing this inquiry. *Cipollone,* 505 U.S. at 516, 112 S.Ct. 2608.

The primary purpose of NSMIA was to preempt state "Blue Sky" laws which required issuers to register many securities with state authorities prior to marketing in the state. By 1996, Congress recognized the redundancy and inefficiencies inherent in such a system and passed NSMIA to preclude states from requiring issuers to register or qualify certain securities with state authorities. *Lander v. Hartford Life & Annuity Ins. Co.,* 251 F.3d 101, 108 (2d Cir.2001). The NSMIA "seeks to further advance the development of national securities markets and eliminate the costs and burdens of duplicative and unnecessary regulation by, as a general rule, designating the Federal government as the exclusive regulator of national offering of securities." Report of Committee on Commerce, H.R. Rep. 104–622, 104th Cong., 2d Sess., at 16 (1996), *reprinted in* 1996 U.S.C.C.A.N. 3877, 3878 ("Commerce Committee Report").

To accomplish this objective, the NSMIA precludes states from imposing disclosure requirements on prospectuses, traditional offering documents and sales literature relating to covered securities.[2] Specifically, the NSMIA has the following three preemption provisions:

(a) Scope of exemption.

Except as otherwise provided in this section, no law, rule, regulation, or order, or other administrative action of any State or any political subdivision thereof—

---

**2.** As discussed further below, whether the NSM Bonds are covered securities as defined by the NSMIA need not be decided. *See infra* Parts II.B & C.

(1) requiring, or with respect to, registration or qualification of securities, or registration or qualification of securities transactions, shall directly or indirectly apply to a security that—

(A) is a covered security; or

(B) will be a covered security upon completion of the transaction;

(2) shall directly or indirectly prohibit, limit, or impose any conditions upon the use of-

(A) with respect to a covered security described in subsection (b) of this section, any offering document that is prepared by or on behalf of the issuer; or

(B) any proxy statement, report to shareholders, or other disclosure document relating to a covered security or the issuer thereof that is required to be and is filed with the Commission or any national securities organization registered under section 78o–3 of this title, ...; or

(3) shall directly or indirectly prohibit, limit, or impose conditions, based on the merits of such offering or issuer, upon the offer or sale of any security described in paragraph (1).

15 U.S.C. § 77r(a). Subsection (a)(1) preempts state laws requiring registration or qualification of covered securities offerings.[3] Congress enacted subsections (a)(2) and (a)(3) to prevent an end run around the first preemption provision by states seeking to impose their own registration requirements. Accordingly, subsection (a)(2) prevents states from imposing, limiting or prohibiting any condition on the use of any offering or disclosure document relating to a covered security while subsection (a)(3) prohibits state regulating authorities from requiring a secu-

rities offering to meet any merit qualifications.

Despite these express preemption provisions, the statute also has a saving clause which permits the states to retain jurisdiction over fraudulent conduct:

> Consistent with this section, the securities commission (or any agency or officer performing like functions) of any State shall retain jurisdiction under the laws of such State to investigate and bring enforcement actions with respect to fraud or deceit, or unlawful conduct by a broker or dealer, in connection with securities or securities transactions.

15 U.S.C. § 77r(c)(1). Thus, states retain the ability to protect investors through application of state anti-fraud laws. As stated by the Conference Committee,

> [t]his preservation of authority is intended to permit state securities regulators to continue to exercise their police power to prevent fraud and broker-dealer sales practice abuses, such as churning accounts or misleading customers. It does not preserve the authority of state securities regulators to regulate the securities registration and offering process through commenting on and/or imposing requirements on the contents of prospectuses or other offering documents
> ...

Conference Report, H.R. Conf. Rep. 104–864, 104th Cong., 2d Sess., at 40 (1996), *reprinted in* 1996 U.S.C.C.A.N. 3920, 3921. In addition, legislative history indicates that it was the "[Commerce] Committee's intention not to alter, limit, expand, or *otherwise affect in any way* any State statutory or *common law* with respect to fraud or deceit ... in connection with securities or securities transactions." Commerce Committee Report at 34, *reprinted*

---

**3.** "Registration" is the process of state agency review and approval before a security is offered and "qualification" is a particular method of gaining state approval.

*in* 1996 U.S.C.C.A.N. at 3897. A more clear cut statement against preemption would be hard to find.

The preemption provisions and saving clause quoted above do not expressly address the NSMIA's preemptive impact on state common law fraud claims for two reasons. *First,* Congress never intended the NSMIA to displace the right to pursue such claims, as demonstrated by the absence of any civil liability or enforcement provisions. *Second,* the NSMIA did not amend the saving provisions of either the Securities Act of 1933 or the Securities Exchange Act of 1934, *see* 15 U.S.C. §§ 77p(a), 78bb(a). Both provisions state that the rights and remedies provided by the federal statutes shall be "in addition to any and all other rights and remedies that may exist at law or in equity." *Id.See also* *Gold v. Blinder, Robinson & Co., Inc.,* 580 F.Supp. 50, 53 (S.D.N.Y.1984) ("existing state remedies are by federal statute coexistent with causes of action created by the 1934 Act").

The fact that the NSMIA left the 1933 and 1934 Acts' saving provisions untouched is particularly telling as Congress has, in the past, specifically amended these provisions when it deemed it appropriate. For example, in response to the perceived migration of securities class actions to state courts in order to circumvent the heightened pleading standard adopted under the Private Securities Litigation Reform Act of 1995, the Securities Litigation Uniform Standards Act of 1998 ("SLUSA"), P.L. 105–353, 112 Stat. 3227 (1998) (codified as amended in part at 15 U.S.C. §§ 77p & 78bb(f)), completely prohibited certain covered class actions brought under state law from being heard in either state or federal court.[4] The fact that the SLUSA specifically amended the 1933 and 1934 Acts to effectuate its preemptive intent cuts against a finding of express preemption here given the NSMIA's silence regarding fraud actions alleging violations of state law. Indeed, the Supreme Court has held that a statute's failure to amend a saving provision of the 1934 Act that preserved the jurisdiction of state securities commissions showed that "Congress did not explicitly prohibit States from regulating takeovers." *Edgar v. MITE Corp.,* 457 U.S. 624, 631, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982). That determination was left to the courts. *See id.*

In sum, the NSMIA's preemption provisions do not expressly preempt state common law fraud claims. Accordingly, such claims must survive in the absence of implied preemption. *See Cipollone,* 505 U.S. at 517, 112 S.Ct. 2608 ("Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted."). The NSMIA governs the national registration of securities, and thus does not address state common law claims. Where there is no express preemption, it is necessary to analyze whether implied preemption may apply. *See Geier v. American Honda Motor Co.,* 529 U.S. 861, 870–71, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000) (when the preemption provision and saving provision reflect a neutral policy toward preemption, ordinary conflict principles

---

4. These provisions, which preclude class actions arising under state laws that mirror federal claims, read as follows:

No covered class action based upon the statutory or common law of any State or subdivision thereof may be maintained in any State or Federal court by any private party alleging—

(1)/(A) an untrue statement or omission of a material fact in connection with the purchase or sale of a covered security; or (2)/(B) that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security.

15 U.S.C. §§ 77p(b), 78bb(f)(1).

still apply). It is to these questions that I now turn.

## C. Implied Preemption

### 1. Implied Field Preemption

■■ "[I]n the absence of explicit statutory language, state law is pre-empted where it regulates conduct in a field that Congress intended the Federal Government to occupy exclusively." *English,* 496 U.S. at 79, 110 S.Ct. 2270. Congress' intent may be evident from a "scheme of federal regulation ... so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it," or where a statute "touch[es] a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Rice,* 331 U.S. at 219, 67 S.Ct. 1146.

■■ However, if the field preempted includes areas that have "been traditionally occupied by the States," congressional intent to supersede state laws must be "clear and manifest." *Jones v. Rath Packing Co.,* 430 U.S. 519, 525, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977). Furthermore, the preemptive force of a federal statute must be "so powerful as to displace entirely any state cause of action" to trigger field preemption. *Franchise Tax Bd. of State of Cal. v. Construction Laborers Vacation Trust for S. Cal.,* 463 U.S. 1, 23, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983).

■■ Few statutes possess the "extraordinary pre-emptive power" required to occupy a field of law so entirely as to characterize any claims arising thereunder as federal. *See Metropolitan Life Ins. Co. v. Taylor,* 481 U.S. 58, 65, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987). The NSMIA is not one of those few.

It is well-settled that federal law does not enjoy complete preemptive force in the field of securities. State securities laws exist in every state, the District of Columbia, and Puerto Rico, and, far from preempting the field, Congress has expressly preserved the role of the states in securities regulation.

\*     \*     \*     \*     \*     \*

The states enjoy broad powers to regulate such diverse subjects as ... fraud in the sale or purchase of securities and the rendering of investment advisory services.

*Baker, Watts & Co. v. Miles & Stockbridge,* 876 F.2d 1101, 1107 (4th Cir.1989) (internal quotation marks and citations omitted). Given the concurrent nature of federal/state jurisdiction over securities, the NSMIA clearly lacks the complete preemptive force needed for field preemption. *See Patterman v. The Travelers, Inc.,* 11 F.Supp.2d 1382, (S.D.Ga.1997) ("Neither the text of the statute nor its legislative history manifest Congress' intent to completely pre-empt state law claims within NSMIA's scope.").

### 2. Implied Conflict Preemption

■ State law can also be preempted to the extent that it actually conflicts with federal law. This type of preemption occurs when it is " 'impossible for a private party to comply with both state and federal requirements, ... or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' " *Association of Int'l Automobile Mfrs., Inc. v. Abrams,* 84 F.3d 602, 607 (2d Cir.1996) (quoting *Freightliner Corp. v. Myrick,* 514 U.S. 280, 287, 115 S.Ct. 1483, 131 L.Ed.2d 385 (1995)).

The one case cited by defendants in favor of express preemption, *Myers v. Merrill Lynch & Co., Inc.,* No. C–98–3532, 1999 WL 696082, at \*9 (N.D.Cal. Aug.23,

1999), *aff'd,* 249 F.3d 1087 (9th Cir.2001), better illustrates an actual conflict scenario. In *Myers,* the plaintiff brought suit alleging that defendants violated the California Business and Professions Code by imposing a "syndicate penalty bid" on customers likely to resell newly acquired shares immediately after a securities' offering. *See id.* at *1. The federal scheme, however, authorized the practice of penalty bids and required individuals imposing such penalty bids "to comply with certain disclosure and recordkeeping requirements." *Id.* at *8.

Defendants argued that plaintiff's state law claims were preempted "because they directly conflict with federal securities laws and regulations, and because they pose an obstacle to the accomplishment of the federal scheme for regulation of securities offerings." *Id.* at *7. Defendants pointed to the NSMIA's legislative history and its purpose "to designate the federal government as the exclusive regulator of national offerings of securities." *Id.* at *8. The court found plaintiff's allegations that defendants engaged in unfair and discriminatory penalty bid practices to be preempted by the express language of the NSMIA. *See id.* at *9. Although the court grounded its holding in terms of express preemption, it implicitly acknowledged the conflict between the federal regulatory scheme, which authorized the use of penalty bids, and California's unfair competition law. *See id.* ("Regulation M requires individuals imposing penalty bids to comply with certain disclosures and recordkeeping requirements.... To the extent that [plaintiff] alleges that defendants' use of penalty bids to discourage flipping are [sic] dishonest, inadequately disclosed, coercive, or misleading, those claims are completely preempted by federal statutes and regulations.").

This case does not present the type of conflict seen in *Myers.* The state law damages action brought by Zuri easily coexists with the regulatory requirements imposed by the NSMIA, making the case more analogous to *Cipollone.* In that case, plaintiff brought suit claiming that his mother's death from lung cancer was caused by years of prolonged smoking. *See Cipollone,* 505 U.S. at 508, 112 S.Ct. 2608. Defendants were allegedly responsible for her smoking because "they breached express warranties contained in their advertising, because they failed to warn consumers about the hazards of smoking, because they fraudulently misrepresented those hazards to consumers, and because they conspired to deprive the public of medical and scientific information about smoking." *Id.*

Defendants argued that all of plaintiff's claims were preempted by the Federal Cigarette Labeling and Advertising Act ("1965 Act"), as amended by the Public Health Cigarette Smoking Act of 1969, which modified the 1965 Act's preemption provision as follows:

§ 5 Preemption

(b) No requirement or prohibition based on smoking and health shall be imposed under State law with respect to the advertising or promotion of any cigarettes the packages of which are labeled in conformity with the provisions of this Act.

*Cipollone,* 505 U.S. at 515, 112 S.Ct. 2608. The Court, however, only found plaintiff's failure to warn claim to be preempted as such claim relied on a state law "requirement or prohibition ... with respect to ... advertising or promotion." *Id.* at 524, 112 S.Ct. 2608. As to plaintiff's other claims, the Court held that the 1965 Act "only preempted state and federal rulemaking bodies from mandating particular cautionary statements and did not pre-empt state-law

damages actions." *Id.* at 519–20, 112 S.Ct. 2608. Accordingly, section 5, as amended, preempted "only the imposition of state-law obligations 'with respect to the advertising or promotion' of cigarettes." *Id.* at 528, 112 S.Ct. 2608. In so holding, the Court stated that "there is no general, inherent conflict between federal pre-emption of state warning requirements and the continued vitality of state common law damages actions." *Id.* at 518, 112 S.Ct. 2608.

██ Here, as in *Cipollone,* there is both a federal regulatory scheme (the NSMIA) and state law fraud claims that are independent of each other. *See Cipollone,* 505 U.S. at 519, 112 S.Ct. 2608 (the term "regulation" most naturally refers to positive enactments by state legislatures and federal agencies, not to common law damages actions). Bringing suit for common law fraud in no way interferes with the regulatory mandates of the NSMIA. In fact, the purpose underlying state common law fraud actions—to deter fraudulent practices—is consistent with federal securities law, including the NSMIA, as both seek to deter fraud. *See Cipollone,* 505 U.S. at 528–29, 112 S.Ct. 2608 ("[I]n the 1969 Act, Congress offered no sign that it wished to insulate cigarette manufacturers from longstanding rules governing fraud ... State-law prohibitions on false statements of material fact do not create 'diverse, nonuniform, and confusing' standards. Unlike state-law obligations concerning the warning necessary to render a product 'reasonably safe,' state-law proscriptions on intentional fraud rely only on a single, uniform standard: falsity."). There can be no implied conflict preemption when the federal and state laws co-exist in harmony. Defendants' motion for partial summary judgment is denied.

## III. CONCLUSION

For the reasons set forth above, defendants' motion for partial summary judgment is denied. A final pre-trial conference in this case and the *Gabriel Capital* case is scheduled for November 7, 2001 at 2:30 p.m. The Clerk of the Court is directed to close this motion.

SO ORDERED.