[No. B189249. Second Dist., Div. One. Jan. 26, 2007.]

CAPITAL RESEARCH AND MANAGEMENT COMPANY et al., Plaintiffs and Respondents, v.
EDMUND G. BROWN, JR., as Attorney General, etc., Defendant and Appellant.
THE PEOPLE ex rel. EDMUND G. BROWN, JR., as Attorney General, etc., Plaintiff and Appellant, v.
AMERICAN FUNDS DISTRIBUTORS, INC., et al., Defendants and Respondents.

COUNSEL

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Thomas Greene, Chief Assistant Attorney General, Mark J. Breckler and Jon M. Ichinaga, Deputy Attorneys General, for Defendant and Appellant and for Plaintiff and Appellant.

Barbara A. Jones, Deborah Zuckerman and Michael Schuster for AARP Foundation as Amicus Curiae on behalf of Defendant and Appellant and Plaintiff and Appellant.

Saint Martin & Fan, Amy Fan; Rex Staples, Stephen Hall, Joseph Brady and Lesley Walker for North American Securities Administrators Association, Inc., as Amicus Curiae on behalf of Defendant and Appellant and Plaintiff and Appellant.

Skadden, Arps, Slate, Meagher & Flom, Raoul D. Kennedy and Seth M. Schwartz for Plaintiffs and Respondents and for Defendants and Respondents.

OPINION

**VOGEL, J.**—NSMIA, the National Securities Markets Improvement Act of 1996, prohibits the states from limiting or imposing any conditions upon the use of "any offering document that is prepared by or on behalf of" the issuer of a covered security (15 U.S.C. § 77r(a)(2)(A)) but permits certain state officers to "bring enforcement actions with respect to fraud or deceit, or unlawful conduct by a broker or dealer, in connection with securities or securities transactions" (15 U.S.C. § 77r(c)(1)). The issue on this appeal is whether NSMIA's savings clause is sufficiently broad to permit the Attorney General of California to pursue injunctive relief and penalties against a covered security's investment advisor and wholesale broker-dealer who allegedly made inaccurate or inadequate representations to purchasers. We conclude that the savings clause applies, and therefore reverse a judgment based on a finding that this action is preempted by federal law.

## FACTS

### A. *The Declaratory Relief Action*

Capital Research and Management Company (CRMC, an investment advisor) and American Funds Distributors, Inc. (AFD, a registered broker-dealer

and wholesale distributor), sued the Attorney General of the State of California for injunctive and declaratory relief concerning the legality of certain commissions and fees paid to broker-dealers selling shares in American Funds (AF Fund).[1] CRMC manages AF Fund's 29 mutual funds (with combined assets of about $600 billion), and AFD distributes AF Fund's shares through "selling group agreements" with more than 2,000 unaffiliated broker-dealers.

According to AFD, its broker-dealers are paid "principally through receipt of dealer commissions and . . . service fees" but about 100 of its top selling dealers are paid an additional amount "to defray the costs of training the dealers' registered representatives . . . who help dealers match appropriate investments to their clients' long term investment needs." The terms of the brokers' compensation are disclosed in AF Fund's prospectuses and other offering documents, including statements of additional information (SAI's), issued by AF Fund and disseminated to prospective investors.[2] CRMC and AFD allege that AF Fund complies with its disclosure obligations by stating in its prospectus that AFD "may pay[] or sponsor informational meetings for[] dealers as described in the [SAI]," and by stating in its SAI that AFD "at its expense (from a designated percentage of its income), currently provides additional compensation to dealers. Currently, these payments are limited to the top 100 dealers who have sold shares of [AF Fund]. . . . These payments are based principally on a pro rata share of a qualifying dealer's

---

[1] A mutual fund is a distinct legal entity that raises money by selling shares and then invests in securities for the benefit of its shareholders. Each fund contracts with an investment adviser who provides management, portfolio selection, and administrative services to the fund, for which the adviser is usually compensated based on a percentage of the fund's total assets. A mutual fund's shares are sold through various channels, one of which is through third party broker-dealers and their sales representatives. A mutual fund compensates its selling broker-dealers by levying a sales charge (a load) on the investors based on a percentage of the amount invested. Typically, an investor pays when making the investment (a front-end load) or later when selling or redeeming the shares (a back-end load). Investors may also pay their third party professionals an annual fee based on the total amount of assets invested, and mutual funds may also charge investors ongoing fees as compensation for costs expended in marketing the fund or for servicing the investor's account. Investment advisers and broker-dealers must register with the Securities and Exchange Commission. (15 U.S.C. § 80b-3.)

[2] Federal law governs the content of both the prospectuses and the SAI's, with the latter providing details beyond those set out in the former. (Registration Form Used by Open-End Management Investment Companies, S.E.C. Release No. 33-7512, 1998 SEC Lexis 438 (Mar. 13, 1998).) The prospectus itself must disclose information about fees paid by the mutual fund from its assets and by the shareholders directly, including dealer commissions to registered representatives employed by broker-dealers for services rendered to investors. (*Id.* at pp. *222–*232.)

sales. [AFD] will, on an annual basis, determine the advisability of continuing these payments."

According to CRMC and AFD, they sought declaratory relief because the Attorney General claims the compensation disclosures are inadequate and "materially false and misleading" in violation of Corporations Code sections 25401 and 25216, notwithstanding that (according to CRMC and AFD) the additional compensation payments to their broker-dealers are "perfectly lawful" because "no state or federal law, rule or regulation . . . bans or otherwise regulates the practice."[3] The declaratory relief complaint alleges that any effort by the Attorney General to stop the payments would be "expressly preempted under the National Securities Markets Improvement Act of 1996" (see NSMIA, Pub.L. No. 104-290, 110 Stat. 3416 (1996) (codified in part at 15 U.S.C. § 77r)) or, if not preempted, would be entirely "without legal or factual merit."

## B.   *The Enforcement Action*

On the same day the declaratory relief action was filed, the Attorney General filed an enforcement action against CRMC and AFD (§§ 25000 et seq., 12658, 12660), alleging that CRMC and AFD were participating in undisclosed "shelf-space agreements," thereby increasing AF Fund's shareholders' costs and creating conflicts of interest.[4] The Attorney General alleges

---

[3] Subsequent undesignated section references are to the Corporations Code. Section 25401 makes it "unlawful for any person to offer or sell a security in this state . . . by means of any written or oral communication which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." As relevant, section 25216, subdivision (a), provides that "[n]o broker-dealer or agent shall effect any transaction in, or induce or attempt to induce the purchase or sale of, any security in this state by means of any manipulative, deceptive or other fraudulent scheme, device, or contrivance."

[4] A "shelf-space" or "revenue-sharing" agreement is one where a mutual fund complex (such as AF Fund) agrees to pay broker-dealers something extra (in addition to loads and other fees) for shelf space (heightened visibility, access to the broker-dealers' registered sales representatives, and placement on preferred or recommended lists). According to the Attorney General, shelf-space agreements "are typically created when a mutual fund's distributor enters into an oral agreement with a broker-dealer to exchange a combination of hard dollars and directed brokerage for a valuable privilege: preferred or exclusive access to the broker-dealer's sales force and heightened visibility within a broker-dealer's distribution or sales systems. The amount of compensation is typically based on percentages of the mutual fund sales by the broker-dealers." According to amicus curiae North American Securities Administrators Association, Inc. (NASAA, an association of state agencies responsible for administering state securities laws), all shelf-space agreements create a "fundamental conflict of interest between what's best for investors and what's best for the advisors, distributors, and broker-dealers that are involved in marketing mutual funds," but directed brokerage shelf-space agreements are particularly onerous because the conflicts they create are unmanageable and so fraught with potential abuse that the SEC has banned the practice altogether, regardless of whether it is disclosed. (See

that undisclosed shelf-space agreements adversely affect the relationship between broker-dealers and mutual funds on the one hand, and their customers on the other, and that the secrecy of these agreements prevents prospective mutual fund investors from recognizing this potential conflict of interest, and prevents mutual fund directors from effectively regulating their funds' distribution practices to protect shareholders.

More specifically, the Attorney General alleges that, between January 2000 and the present, AFD maintained approximately 100 shelf-space agreements with broker-dealers, the majority of which were undisclosed "oral agreements entered into between AFD and the shelf-space brokers with express, reciprocal terms that were understood by both parties to the agreements." Pursuant to the formula stated in these agreements, AFD (subsidized by CRMC) paid cash and directed brokerage to the shelf-space brokers who sold AF Fund's shares and, in turn, received preferred access to the shelf-space brokers' registered sales representatives. The shelf-space agreements are not accurately or fully disclosed in AF Fund's disclosure documents.

Based on the facts summarized above, the Attorney General's enforcement action pleads two causes of action against AFD and CRMC, one for violations of section 25401, the other for violations of section 25216, subdivision (a), alleging that in selling AF Fund's shares, AFD (with the connivance of CRMC) violated these statutes by failing to disclose to purchasers and prospective purchasers of AF Fund's shares the facts about the shelf-space agreements that would allow them to understand the import of the statements made by AF Fund in its disclosure documents.

The Attorney General's complaint seeks injunctions enjoining AFD and CRMC from engaging in any conduct in violation of sections 25401 and 25216, civil penalties, disgorgement of profits, and restitution to the purchasers.

## C.  *The Trial Court Proceedings*

The declaratory relief and enforcement actions were consolidated and discovery was stayed pending a determination of the preemption issue.

CRMC and AFD demurred to the enforcement complaint, contending NSMIA expressly or impliedly preempts any action challenging the adequacy

---

Prohibition on the Use of Brokerage Commissions to Finance Distribution, S.E.C. Release No. IC-26591, 2004 WL 1969665 (Sept. 2, 2004).) The legality of the shelf-space agreements is not before us on this appeal.

of AF Fund's disclosures. The Attorney General filed opposition, pointing out that it had sued CRMC and AFD, not AF Fund, and that its complaint challenged the broker-dealers' alleged fraud, not AF Fund's disclosures. For its part, the trial court overruled the demurrer based on express preemption—but authorized a second demurrer on the implied preemption theory, and CRMC and AFD demurred again. The trial court accepted the implied preemption argument, found the savings clause did not salvage the enforcement action, and on that basis sustained the demurrer without leave to amend. CRMC and AFD then dismissed their declaratory relief action, and the court entered a final judgment in their favor, from which the Attorney General now appeals.

## DISCUSSION

The Attorney General contends his enforcement action is not preempted. We agree.

### A.

Preemption occurs three ways: (1) where federal law states expressly that state law is preempted; (2) where federal law is so comprehensive that it leaves no room in the covered field for supplementary state regulation; and (3) where there is an actual conflict between state and federal law. (*California Federal S. & L. Assn. v. Guerra* (1987) 479 U.S. 272, 280–281 [93 L.Ed.2d 613, 107 S.Ct. 683].) The issue is one of congressional intent (*Jevne v. Superior Court* (2005) 35 Cal.4th 935, 949 [28 Cal.Rptr.3d 685, 111 P.3d 954]; *County of Los Angeles v. Smith* (1999) 74 Cal.App.4th 500, 507 [88 Cal.Rptr.2d 159]), and our task is to divine that intent by examining NSMIA's language as well as its structure and purpose (*Ingersoll-Rand Co. v. McClendon* (1990) 498 U.S. 133, 137–138 [112 L.Ed.2d 474, 111 S.Ct. 478]).[5]

### B.

"The primary purpose of NSMIA was to preempt state 'Blue Sky' laws which required *issuers* to register many securities with state authorities

---

[5] The Attorney General contends there is a presumption against preemption in this case because his enforcement action is an exercise of the state's police powers. (*Bronco Wine Co. v. Jolly* (2004) 33 Cal.4th 943, 989 [17 Cal.Rptr.3d 180, 95 P.3d 422].) CRMC and AFD disagree, claiming there is no presumption here because there is a significant history of federal presence in the field of securities regulation. (*Southern Cal. Edison Co. v. Public Utilities Com.* (2004) 121 Cal.App.4th 1303, 1312 [18 Cal.Rptr.3d 435]; *Mayo v. Dean Witter Reynolds, Inc.* (N.D.Cal. 2003) 258 F.Supp.2d 1097, 1108.) We need not resolve this conflict because, in either event, we would reach the same result based on the "clear or manifest intent on the part of Congress" shown by the language of the statute itself as well as its congressional history. (*Bronco Wine Co. v. Jolly, supra,* 33 Cal.4th at p. 989.)

prior to marketing in the state. . . . Congress recognized the redundancy and inefficiencies inherent in such a system and passed NSMIA to preclude states from requiring *issuers* to register or qualify certain securities with state authorities." (*Lander v. Hartford Life & Annuity Ins. Co.* (2d Cir. 2001) 251 F.3d 101, 108, italics added.) To that end, NSMIA provides for exclusive federal registration of nationally traded securities (15 U.S.C. §§ 77f, 77r(b)), including the mutual fund shares at issue in this case (15 U.S.C. §§ 77b(a)(1), 77r(b)), and provides (as relevant): "*Except as otherwise provided in this section*, no law, rule, regulation, or order, or other administrative action of any State . . . [¶] (1) requiring, or with respect to, registration or qualification of securities, or registration or qualification of securities transactions, shall directly or indirectly apply to a security that . . . [¶] . . . is a covered security; . . . [¶] . . . [¶] (2) *shall directly or indirectly prohibit, limit, or impose any conditions upon the use of*[,] [¶] . . . *with respect to a covered security . . . , any offering document that is prepared by or on behalf of the issuer*; or [¶] . . . [¶] (3) shall directly or indirectly prohibit, limit, or impose conditions, based on the merits of such offering or issuer, upon the offer or sale of any [covered] security . . . ." (15 U.S.C. § 77r(a), italics added; see also *id.*, § 77r(d).) At least indirectly, the Attorney General's enforcement action seeks relief that would impose conditions on the use of AF Fund's offering documents by its investment adviser and broker-dealers—and it is thus indisputably covered by this express preemption provision.[6]

■   But the enforcement action just as plainly comes within NSMIA's savings clause, which provides: "Consistent with this section, *the securities commission (or any agency or office performing like functions) of any State shall retain jurisdiction under the laws of such State to investigate and bring enforcement actions with respect to fraud or deceit, or unlawful conduct by a broker or dealer, in connection with securities or securities transactions.*" (15 U.S.C. § 77r(c)(1), italics added.) The plain language of the savings clause and its legislative history persuade us that Congress intended to preserve the states' antifraud authority to control the conduct of brokers and dealers, notwithstanding that the exercise of such controls might prospectively influence the disclosures made by a covered security. Put another way, the Attorney General's action has all of the attributes necessary to bring it

---

[6] In *Zuri-Invest AG v. NatWest Finance Inc.* (S.D.N.Y. 2001) 177 F.Supp.2d 189, 194, an action by one private company against another, a New York court found NSMIA's preemption provision does not expressly preempt state common law fraud claims. *Zuri-Invest* did not consider an enforcement action asserting claims arising under state securities statutes, and thus is not inconsistent with our finding of express preemption. It is worth noting that *Zuri-Invest* also rejected claims of implied and conflict preemption and thus refused to dismiss the fraud claims. In any event, the real issue in our case is whether the savings clause applies, not whether we are dealing with express or implied preemption.

squarely within the ambit of the savings clause. It is (1) an enforcement action (2) brought by a state officer performing the functions of a securities commission, (3) under California law (4) with regard to fraud and deceit (5) in connection with covered securities transactions.

## C.

The trial court found an ambiguity where none exists (the court said the "express preemption provision, when read in conjunction with the savings clause, is ambiguous on its face as to what state claims are permitted"). We see no ambiguity in the preemption provision or the savings clause. Although the preemption provision expressly prohibits any state from imposing conditions on the use of a covered security's offering documents, the savings clause gives the Attorney General authority to "bring enforcement actions with respect to fraud or deceit, or unlawful conduct by a broker or dealer, in connection with securities or securities transactions." (15 U.S.C. § 77r(c)(1).) What this means is that the Attorney General cannot sue AF Fund to force it to change its disclosure documents, but it can sue AFD and CRMC to force *them* to disclose their oral agreements with the shelf-space brokers. The savings clause is sufficiently broad to permit this action (cf. *Dowhal v. SmithKline Beecham Consumer Healthcare* (2004) 32 Cal.4th 910, 925 [12 Cal.Rptr.3d 262, 88 P.3d 1]), and as applied to this case is entirely consistent with the purpose of NSMIA.

It is the wholesale distributor's conduct that is at issue in this case (and the enabling conduct of the adviser), not the sufficiency of the disclosures made by AF Fund. In fact, the complaint alleges that AFD's and CRMC's disclosures were affirmatively false and misleading because the practice of entering shelf-space agreements was intentionally concealed from investors and also from AF Fund's directors. It is the conduct of the adviser and the distributor that (according to the Attorney General) violates sections 25401 and 25216, subdivision (a)—because the purchasers are being induced to purchase AF Fund shares by means of manipulative, deceptive, and otherwise fraudulent contrivances. (See *S. E. C. v. Capital Gains Bureau.* (1963) 375 U.S. 180 [11 L.Ed.2d 237, 84 S.Ct. 275] [failure to disclose financial incentives in investment recommendation is actionable fraud]; *Siemers v. Wells Fargo & Co.* (N.D.Cal., Aug. 14, 2006, No. C 05-04518 WHA) [2006 WL 2355411 at pp. *4–*7] [failure to disclose details of shelf-space agreements is a material omission].) The fact that this action, if successful, might

indirectly encourage AF Fund to alter its disclosure documents does not affect the application of the savings clause.

## D.

Our conclusion is supported by the clear statement of congressional intent expressed at the time the savings clause was enacted.

By way of example, a Senate Report explained that the statute preserved the states' authority to "continue their role in *regulating broker-dealer conduct* whether or not the offering is subject to state review. The [Senate] Committee believes that allowing the states to oversee broker-dealer conduct in connection with preempted offerings will ensure continued investor protection. As long as states continue to police fraud in these offerings, compliance at the federal level will adequately protect investors. In preserving this authority, however, the Committee expects the states only to police conduct— not to use this authority as justification to continue reviewing exempted registration statements or prospectuses. The Committee clearly does not intend for the 'policing' authority to provide states with a means to undo the state registration preemptions." (Sen. Rep. No. 104-293, 2d Sess. (1996) [1996 WL 367191 at p. *15], italics added.) The Attorney General's enforcement action, which challenges broker-dealer conduct, cannot reasonably be construed as an effort to regulate a nonparty issuer.

The Joint Conference Report of both houses offers a similar insight into the purpose of the savings clause. *"The [statute preserves] the authority of the states to protect investors through application of state antifraud laws. This preservation of authority is intended to permit state securities regulators to continue to exercise their police power to prevent fraud and broker-dealer sales practice abuses, such as churning accounts or misleading customers.* It does not preserve the authority of state securities regulators to regulate the securities registration and offering process through commenting on and/or imposing requirements on the contents of prospectuses or other offering documents, whether prior to their use in a state or after such use." (H.R. Conf. Rep. No. 104-864, 2d Sess., at p. 40 (1996), reprinted in 1996 U.S. Code Cong. & Admin. News, at p. 3921, italics added.)

So too does the House Committee on Commerce Report: "State governments generally retain authority to . . . bring actions pursuant to State laws and regulations prohibiting fraud and deceit, including broker-dealer sales practices abuses. [¶] . . . [¶] [After noting that Congress did intend to prevent the states from indirectly circumventing the preemption clause, the Commit-

tee explains that it] does not intend . . . that the extension of the prohibition to indirect actions by State regulators restrict or limit their ability to investigate, bring actions, or enforce orders, injunctions, judgments or remedies based on alleged violations of State laws that prohibit fraud and deceit or that govern broker-dealer sales practices in connection with securities or securities transactions. [¶] . . . [¶]

". . . The Committee intends to preserve the ability of the States to investigate and bring enforcement actions under the laws of their own State with respect to fraud and deceit (including broker-dealer sales practices) in connection with any securities or any securities transactions, whether or not such securities or transactions are otherwise preempted from State regulation by [15 U.S.C. § 77r]. It is the Committee's intent that the limitations on State law established by [15 U.S.C. § 77r] apply to State law registration and regulation of securities offerings, and do not affect existing State laws governing broker-dealers, including broker-dealer sales practices. . . .

"If . . . a State had undertaken an enforcement action that alleged, for example, that the prospectus contained fraudulent financial data or failed to disclose that principals in the offering had previously been convicted of securities fraud, it is conceivable that State laws regarding fraud and deceit could serve as the basis of a judgment or remedial order that could include a restriction or prohibition on the use of the prospectus or other offering document or advertisement within that State. The Committee does not intend [the preemption provision] to be interpreted in a manner that would prohibit such judgments or remedial orders. [¶] It is also the Committee's intention not to alter, limit, expand, or otherwise affect in any way any State statutory or common law with respect to fraud or deceit, including broker-dealer sales practices, in connection with securities or securities transactions." (H.R.Rep. No. 104-622, 2d Sess., pp. 16, 30, 33–34 (1996), reprinted in 1996 U.S. Code Cong. & Admin. News, pp. 3878, 3892, 3896–3897.)

## E.

We agree with CRMC and AFD that NSMIA must not be construed so as to render any of its provisions superfluous (*Kanter v. Warner-Lambert Co.* (2002) 99 Cal.App.4th 780, 791 [122 Cal.Rptr.2d 72]), but observe that it is their construction that would do precisely that by rendering the savings clause superfluous. Noticeably absent from their brief is any suggestion about what it is the savings clause might permit if construed to prohibit a challenge to a distributor's failure to disclose the existence and effect of its own oral shelf-space agreements and the conflicts allegedly created by such agree-

ments. The accepted purpose of NSMIA is to prevent the states from subjecting covered securities to registration requirements, whereas the purpose of the savings clause is to allow the states, in an exercise of their historic police function, to take such action as is necessary to prevent fraud in the sale of covered securities. (See *Zuri-Invest AG v. Natwest Finance Inc., supra,* 177 F.Supp.2d 189; *Gabriel Capital, L.P. v. Natwest Finance, Inc.* (S.D.N.Y. 2000) 94 F.Supp.2d 491, 499; and see *Patterman v. Travelers, Inc.* (S.D.Ga. 1997) 11 F.Supp.2d 1382.) Accordingly, there is nothing about our holding that defeats the purpose of NSMIA (cf. *Etcheverry v. Tri-Ag Service, Inc.* (2000) 22 Cal.4th 316, 328 [93 Cal.Rptr.2d 36, 993 P.2d 366], overruled in part by *Bates v. Dow Agrosciences LLC* (2005) 544 U.S. 431, 436, 452–454 [161 L.Ed.2d 687, 125 S.Ct. 1788]).[7]

Viewed from this perspective, we conclude that Congress had not one but two objectives when it enacted NSMIA—the primary intent to promote national uniformity in the securities registration process by preempting state Blue Sky laws, and the secondary but equally important intent to encourage the continued participation of the states in preventing fraud in securities transactions, particularly with regard to broker-dealers. (Di Trolio, *Public Choice Theory, Federalism, and the Sunny Side to Blue-Sky Laws* (2004) 30 Wm. Mitchell L.Rev. 1279, 1295; Friedman, *The Impact of NSMIA on State Regulation of Broker-Dealers and Investment Advisers* (1998) 53 Bus. Law. 511.)[8]

---

[7] Our conclusion is supported by a number of unpublished opinions from other states. (E.g., *Target Oil & Gas Corp. v. Commonwealth of Kentucky* (Ky.Ct.App., May 26, 2006, No. 2004-CA-001947-MR) 2006 WL 1443980; *Galvin v. Gillette Co.* (Mass.Super.Ct., Apr. 28, 2005, No. 051453BLS) 2005 WL 1155253.)

[8] We summarily reject the trial court's finding that the savings clause preserved only common law fraud claims (which require an intent to deceive), not those arising under sections 25401 and 25216, subdivision (a). (*S. E. C. v. Capital Gains Bureau., supra,* 375 U.S. at p. 192; *Kubik v. Goldfield* (3d Cir. 1973) 479 F.2d 472, 476, fn. 6 [under the securities statutes, fraud is not limited to the common law elements of deceit].) We also reject CRMC's and AFD's contention that the savings clause does not preserve the Attorney General's enforcement action on the ground that the relief sought conflicts with federal law (*Cipollone v. Liggett Group, Inc.* (1992) 505 U.S. 504, 517 [120 L.Ed.2d 407, 112 S.Ct. 2608]). CRMC and AFD have not pointed to a specific federal law, standard, or policy that conflicts with the relief sought against CRMC and AFD and we know of none. (*Chamberlan v. Ford Motor Co.* (N.D.Cal. 2004) 314 F.Supp.2d 953, 963; and see *Zuri-Invest AG v. Natwest Finance Inc., supra,* 177 F.Supp.2d at pp. 195–197 [finding no conflict between NSMIA and New York's antifraud laws because conflict preemption occurs only when it is impossible for a private party to comply with both state and federal requirements or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress].)

## DISPOSITION

The judgment is reversed, and the cause is remanded to the trial court with directions to enter a new order overruling the demurrer to the Attorney General's enforcement complaint, directing CRMC and AFD to answer, striking the dismissal of the declaratory relief action, directing the Attorney General to answer the declaratory relief complaint, and setting the case on track for trial. The parties are to pay their own costs of appeal, subject to reallocation by the trial court at the conclusion of this case.

Mallano, Acting P. J., and Willhite, J.,* concurred.

A petition for a rehearing was denied February 14, 2007, and the petition of all respondents for review by the Supreme Court was denied May 16, 2007, S150776.

---

*Associate Justice of the Court of Appeal, Second Appellate District, Division Four, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.