Faye GRIFFIN, in her official capacity as Treasurer of Jefferson County; and Board of County Commissioners of Jefferson County, Plaintiffs–Appellees and Cross–Appellants,

v.

CAPITAL SECURITIES OF AMERICA, Inc.; Jerry Manning; and Adam Alves, Defendants–Appellants and Cross–Appellees.

No. 09CA1659.

Colorado Court of Appeals, Div. IV.

Sept. 30, 2010.

Ellen G. Wakeman, County Attorney, Patricia Gilbert, Assistant County Attorney, Eric T. Butler, Assistant County Attorney, James L. Burgess, Assistant County Attorney, Golden, Colorado, for Plaintiffs–Appellees and Cross–Appellants.

Snell & Wilmer, L.L.P., Scott C. Sandberg, Jessica E. Yates, Denver, Colorado, for Defendants–Appellants and Cross–Appellees.

John W. Suthers, Attorney General, Daniel D. Domenico, Solicitor General, Russell B. Klein, First Assistant Attorney General, Denver, Colorado, for Amicus Curiae Colorado Securities Commissioner.

Opinion by Judge WEBB.

This case involves remedies available to Jefferson County based on its purchase of unrated collateralized mortgage obligations (CMOs) from defendants, Capital Securities of America, Inc., Jerry Manning, and Adam

Alves (Capital Securities). Plaintiffs, Faye Griffin in her official capacity as the Treasurer, and the Board of County Commissioners, of Jefferson County (Jefferson County), sued Capital Securities for damages on the basis that because the CMOs were unrated, the sale violated section 24–75–601.1, C.R.S.2010. According to Capital Securities, section 24–75–601.1 is preempted by federal law or, alternatively, section 24–75–601.1(1.5) does not provide a private damages remedy.

Following a bench trial, the court found that Capital Securities had violated section 24–75–601.1, which was not preempted. However, it denied Jefferson County's request for statutory damages measured under section 24–75–601.1(1.5) and instead ordered disgorgement of Capital Securities' commission on the sales.

We conclude that section 24–75–601.1 is not preempted by federal law; section 24–75–601.1(1.5) does not provide an implied damages remedy; and the trial court properly awarded disgorgement under common law principles. Therefore, we affirm the judgment.

## I. Undisputed Facts

Under the prior version of section 24–75–601.1, a public entity such as Jefferson County could purchase unrated securities issued by the Federal Home Loan Mortgage Corporation (FHLMC) and the Federal National Mortgage Association (FNMA). In August 2006, the legislature amended section 24–75–601.1 to provide, in pertinent part:

(1) It is lawful to invest public funds in any of the following securities:

. . . .

(b)(I) Any security issued by, fully guaranteed by, or for which the full credit of the following is pledged for payment: The federal farm credit bank, the federal land bank, a federal home loan bank, *the federal home loan mortgage corporation, the federal national mortgage association* . . . .

(II) No security may be purchased pursuant to this paragraph (b) *unless, at the time of purchase, the security is rated in its highest rating category by two or more nationally recognized organizations* that regularly rate such obligations and no such organizations rate the security lower than its highest rating category. . . .

. . .

(1.5) Any firm that sells any financial instrument that fails to comply with the provisions of this section to any public entity in the state of Colorado shall, upon demand of the public entity through the state treasurer, repurchase such instruments for the greater of the original purchase principal amount or the original face value, plus any and all accrued interest, within one business day of the demand.

(Emphasis added.)

After section 24–75–601.1 had been amended, Capital Securities sold four unrated FHLMC CMOs to Jefferson County. The sales had not been solicited by Capital Securities, but were made at the specific request of then County Treasurer Mark Paschall, whose term was about to expire. Capital Securities received commissions for the sales totaling $213,576.82.

On taking office, Griffin concluded that the purchase of these CMOs was unlawful under section 24–75–601.1. Based on section 24–75–601.1(1.5), she demanded that Capital Securities repurchase the CMOs. Capital Securities declined to do so.

Based on the requirement of section 24–75–601.3, C.R.S.2010, that a "public entity shall divest itself of any investment which is not included as a lawful investment in section 24–75–601.1 or other statutory authority within six months of the initial disclosure of the existence of such investment," Jefferson County sold the CMOs. The trial court found that it did not suffer any damages as a result of these sales.

## II. Federal Preemption

Capital Securities first contends section 24–75–601.1 is preempted by two federal statutes—15 U.S.C. § 77r of the National Securities Markets Improvement Act (NSMIA), and, as applied here, the Federal Home Loan Mortgage Corporation Act

(FHLMCA), 12 U.S.C. § 1451, et seq. We discern no preemption.[1]

## A. Law

Under the Supremacy Clause of the United States Constitution, U.S. Const. art. 6, cl. 2, state statutes that conflict with federal statutes are invalid. *Colorado Mining Ass'n v. Bd. of County Comm'rs*, 199 P.3d 718, 737 (Colo.2009).

Federal preemption of state law is "fundamentally a question of congressional intent," *Banner Advertising, Inc. v. City of Boulder*, 868 P.2d 1077, 1080 (Colo.1994), subject to de novo review. *Kohn v. Burlington N. & Santa Fe R.R.*, 77 P.3d 809, 811 (Colo.App.2003). "An analysis of federal preemption issues begins with 'the basic assumption that Congress did not intend to displace state law.'" *Middleton v. Hartman*, 45 P.3d 721, 731 (Colo.2002) (quoting *Maryland v. Louisiana*, 451 U.S. 725, 746, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981)).

Express preemption occurs when federal law explicitly preempts state law. *State v. The Mill*, 887 P.2d 993, 1004 (Colo. 1994); *see English v. General Electric Co.*, 496 U.S. 72, 78–79, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990). Federal law also preempts state law when the two conflict, making simultaneous compliance with both laws impossible. *English*, 496 U.S. at 79, 110 S.Ct. 2270; *The Mill*, 887 P.2d at 1004; *see City of Grand Junction v. Ute Water Conservancy Dist.*, 900 P.2d 81, 87 (Colo.1995) ("Actual conflict occurs ... when the state law stands as an obstacle to the accomplishment and execution of the full purpose and objectives of Congress.").[2]

## B. 15 U.S.C. § 77r(a)

Capital Securities first argues that the NSMIA, "expressly preempts state laws that impose qualifications or merit-based limits on covered securities," such as the rating requirement in section 24–75–601.1(1)(b)(II). We disagree.

The NSMIA provides in relevant part:

(a) Scope of exemption

Except as otherwise provided in this section, no law, rule, regulation, or order, or other administrative action of any State . . .

(1) requiring, or with respect to, registration or *qualification of securities*, or registration or qualification of securities transactions, shall directly or indirectly apply to a security that . . .

(A) is a covered security . . .

(3) shall directly or indirectly prohibit, limit, or impose conditions, based on the merits of such offering or issuer, upon the offer or *sale of any security* described in paragraph (1).

15 U.S.C. § 77r (emphasis added).[3]

"Each state has its own statutory law governing securities offerings. These state statutes are often referred to as 'blue sky' laws." Thomas Lee Hazen, *Treatise on the Law of Securities Regulation* § 8.1(1)(C) (6th ed. 2009). Such laws, many patterned on the Uniform Securities Act, "are constructed so that registration of securities is the norm and exemption from such registration the exception." 12 Joseph C. Long, *Blue Sky Law* § 6:2; *see* Uniform Securities Act 2002 § 301 (every security offered or sold in a state must be registered or exempt). As a corollary of the registration requirement, these statutes prohibit selling or offering to sell unregistered securities absent an exemption. *See* Uniform Securities Act 2002 § 301.

In contrast to state patchwork regulation, the purpose of the NSMIA was to "advance the development of national securities markets and eliminate the costs and burdens of duplicative and unnecessary regulation by ... designating the Federal government as

---

1. We decline to address Capital Securities' arguments based on the FNMA, 12 U.S.C. § 1723c, because Jefferson County does not cross-appeal the trial court's denial of relief related to this statute.

2. Because Capital Securities does not argue implied preemption, *see, e.g., Banner Advertising,* *Inc. v. City of Boulder,* 868 P.2d 1077, 1081–83 (Colo.1994), we limit our analysis to express preemption and conflict preemption.

3. The parties do not dispute that FHLMC CMOs at issue are "covered securities" under the NSMIA.

the exclusive regulator of national offerings of securities." Report of Committee on Commerce, H.R. Rep. 104–622, 104th Cong., 2d Sess., at 16 (1996), *reprinted in* 1996 U.S.C.C.A.N. 3877, 3878; *see also* Hazen, § 8.1(3) ("In 1996, Congress significantly limited the role of state law in securities regulation" when it passed the NSMIA).

Capital Securities concedes that the NSMIA would not preempt a state law that only prohibited the *purchase* of covered securities by public entities, as does section 24–75–601.1(1) [4]. Nevertheless, it argues that because section 24–75–601.5, C.R.S.2010, imposes liability on "[a]ny person who sells or causes to be sold to a public entity any investment which is not a lawful investment for such public entity pursuant to section 24–75–601.1," [5] it impermissibly "directly or indirectly prohibit[s], limit[s], or impose[s] conditions, based on *the merits* of such offering or issuer, upon the ... *sale* of any [covered] security." 15 U.S.C. § 77r(a)(3) (emphasis added).

But section 77r(a)(3) must be viewed in the context of the broader prohibition on state registration or qualification. *See Sobitan v. Glud*, 589 F.3d 379, 382 (7th Cir.2009) ("Context, not just literal text, will often lead a court to Congress' intent in respect to a particular statute." (quoting *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 127, 125 S.Ct. 1453, 161 L.Ed.2d 316 (2005) (Breyer, J., concurring))). From this perspective, Capital Securities' argument is unpersuasive for two reasons. First, section 24–75–601.1(1) does not require registration or otherwise limit offerings of covered securities in Colorado. Second, while the "highest rating category" restriction constitutes a merit-based requirement and section 24–75–601.5 imposes liability for the sale of noncomplying securities, these provisions restrict only sales to entities covered by 24–75–601.1, not to other potential purchasers.

" 'Registration' is the process of state agency review and approval before a security

is offered and 'qualification' is a particular method of gaining state approval." *Zuri–Invest AG v. Natwest Finance Inc.*, 177 F.Supp.2d 189, 193 n. 3 (S.D.N.Y.2001); *see* Uniform Securities Act 2002 § 301 ("It is unlawful for a person to offer or sell a security in this State unless: (1) the security is a federal covered security; (2) the security, transaction, or offer is exempted from registration ...; or (3) the security is registered under this [Act]."); Uniform Securities Act 2002 § 304 (Securities Registration by Qualification).

15 U.S.C. § 77r is entitled: "Exemption from State regulation of securities *offerings*" (emphasis added). *Cf. United States v. Nader*, 542 F.3d 713, 717 (9th Cir.2008) (courts may consider the title of a statute to determine legislative intent). The plain language of section 77r(a)(1) preempts state laws requiring "registration or qualification" of covered securities offerings. *See* Hazen, § 8.1(3) ("[P]articularly affected [were] the registration and reporting requirements applicable to securities transactions."). Because section 24–75–601.1 does not impose any registration or qualification requirements on the offering of a covered security, it is not within the prohibition of 15 U.S.C. § 77r(a)(1).

Additionally, some states use a "merit review" approach to the offering of securities, which involves an administrative determination regarding fairness to investors. Rapp & Berckmueller, *Testing the Limits of NSMIA Preemption: State Authority to Determine the Validity of Covered Securities and to Regulate Disclosure*, 63 Bus. Law. 809, 854 n. 39 (May 2008). Hence, "[i]f a state securities regulator is not satisfied with the fairness of an offering, the regulator can refuse to 'qualify' the offering in that state, i.e., refuse to declare the registration effective, thus preventing the offering in that state." *Id.; see* 12 *Blue Sky Law* § 1:48 ("The heart of merit regulation under the Uniform Act is found in

---

4. States may enact laws precluding or limiting the purchase of Federal Home Loan Mortgage Corporation (FHLMC) securities under 12 U.S.C. § 1455(e)(2), discussed more fully in the following section of this opinion.

5. Because in Section III of this opinion we conclude that section 24–75–601.1(1.5) does not create a private remedy for damages, we need not separately address preemption concerning this section.

Section 306(a)(2), which authorizes the administrator to refuse registration under certain circumstances.").

In this regard, the NSMIA also "prohibits State governments from requiring the registration of, or *otherwise imposing* conditions on, offerings of 'covered securities.'" Report of Committee on Commerce, H.R. Rep. 104–622, 104th Cong., 2d Sess., at 29 (1996), *reprinted in* 1996 U.S.C.C.A.N. 3877, 3892 (emphasis added). Congress enacted 15 U.S.C. § 77r(a)(3) "to prevent an end run around the first preemption provision [section (a)(1) ] by ... prohibit[ing] state regulating authorities from requiring a securities offering to meet any merit qualifications." *Zuri–Invest AG*, 177 F.Supp.2d at 193; *see* Report of Committee on Commerce, H.R. Rep. 104–622, 104th Cong., 2d Sess., at 30 (1996), reprinted in 1996 U.S.C.C.A.N. 3877, 3892 ("By extending the prohibition to indirect State action, the Committee specifically intends to prevent State regulators from circumventing the provisions of section [77r(a) ] . . . .").

Section 24–75–601.1(1)(b)(II) requires a rating, which necessarily involves a merit-based determination. *See* J. William Hicks, *Civil Liabilities: Enforcement & Litigation Under the 1933 Act* § 6:107 (June 20 10) ("A company involved in the securities rating service provides expert opinion regarding the risks associated with particular investments"). Hence, we must consider whether 15 U.S.C. § 77r(a)(3) preempts this requirement, but conclude that it does not.

Unlike state laws that make a merit-based determination a component of, or apply it in lieu of, registration or qualification to offer a security, under section 24–75–601.1 lack of a rating does not preclude offering a covered security in Colorado. Rather, it only limits sales of such securities to a narrow class of potential purchasers. Were this requirement part of a registration or qualification process, the securities could not be offered without an exemption. *See* § 11–51–301, C.R.S.2010 ("It is unlawful for any person to offer to sell or sell any security in this state unless it is registered under this article or unless the security or transaction is exempted. . . ."). Therefore, despite the rating requirement in

section 24–75–601.1(1)(b)(II), section 24–75–601.1 still is not the type of state law that is preempted by the NSMIA.

We are not persuaded otherwise by Capital Securities' argument that this interpretation ignores the term "sale," as used in section 77r(a)(3). *See Shipbuilders Council v. United States Coast Guard,* 578 F.3d 234, 244 (4th Cir.2009) ("In interpreting statutes and regulations, we have a duty, where possible, 'to give effect' to all operative portions of the enacted language, including its 'every clause and word.'" (quoting *Duncan v. Walker,* 533 U.S. 167, 174, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001))).

Most state securities laws prohibit both the sale and offering of unregistered securities. *See* Uniform Securities Act 2002 § 301; 12 *Blue Sky Law* § 1:69 (under the Uniform Securities Act "every security offered or sold in a state [must] be registered or exempt"). Colorado is no exception. § 11–51–301. Similarly, state securities laws that require merit review prohibit securities from being offered or sold within the state if those securities do not meet certain merit conditions. *See* 12 *Blue Sky Law* § 1:43 (following merit review, any offerings "which were not 'fair, just, or equitable' to the investor or which were not 'based upon sound business principles ... were simply denied registration and, therefore, could not be lawfully sold in the state" (footnotes omitted)); Fla. Stat. § 517.111(1)(i) (the office may deny registration if "*offer or sale* of such securities would not be fair, just, or equitable").

Therefore, Capital Securities is correct to the extent that by referencing "sale," 15 U.S.C. § 77r(a)(3) preempts any state laws which go beyond registration and qualification restrictions on offering covered securities within a state by prohibiting sales of such securities within the state based on merit review or conditions. Nevertheless, section 24–75–601.5 is not such a broad prohibition. To the contrary, just as section 24–75–601.1 does not prohibit offering covered securities that are unrated throughout Colorado, section 24–75–601.5 does not impose liability for sales to any purchaser other than a public entity subject to section 24–75–601.1. Hence, the reference to "sale" in 15 U.S.C.

§ 77r(a)(3) does not preempt section 24–75–601.1.

Accordingly, because section 24–75–601.1 does not impose any broad registration, qualification requirements, or other merit-based conditions on the offering or sale of covered securities within Colorado, nor does it achieve a similar objective by totally prohibiting sale of such securities within the state for failure to fulfill a merit-based condition, we conclude that it is not expressly preempted by 15 U.S.C. § 77r.

## C. FHLMCA

■ Capital Securities next contends section 24–75–601.1 is preempted by the FHLMCA because "imposing liability on the sellers of FHLMC securities … stands as an obstacle to Congress's objectives" under this statute. Again, we discern no preemption.

12 U.S.C. § 1455 of the FHLMCA provides in relevant part:

> (e) Authority to purchase, hold, or invest by person, trust, or organization
>
> (1) … [A]ny State shall be authorized to purchase, hold, and invest in mortgages, obligations, or other securities which are or have been sold by the [FHLMC]. …
>
> (2) The provisions of paragraph (1) shall not apply with respect to … any State which, after December 21, 1979, enacts a statute which specifically names the [FHLMC] and *either prohibits or provides for a more limited authority to purchase, hold, or invest in such securities* ….

(Emphasis added.)

Here, Capital Securities acknowledges that 12 U.S.C. § 1455(e)(2) allows a state to limit or prohibit the purchase of FHLMC securities by public entities. But it argues that imposing liability on sellers under section 24–75–601.5 who fail to comply with section 24–75–601.1 "adversely impacts the good market reputation of FHLMC and … chills the demand for FHLMC … securities," thus creating a conflict with the purposes of the FHLMCA. We are not persuaded.

Capital Securities relies on numerous sections of the FHLMCA, *see, e.g.,* 12 U.S.C. § 1455(g), and other authorities discussing the history and purpose of the Act, *see* Pub.L. 91–351, to demonstrate a conflict with section 24–75–601.1. However, its reliance is misplaced because the FHLMCA's express allowance in section 1455(e)(2) for state laws such as section 24–75–601.1 defeats a conflict preemption claim. *See Rhodes v. Stewart,* 705 F.2d 159, 163 (6th Cir.1983) (there can be no preemption, however, where Congress "expressly and concurrently authorizes" state legislation on the subject); *Suter v. City of Lafayette,* 57 Cal.App.4th 1109, 1121, 67 Cal. Rptr.2d 420, 426 (1997) (no preemption where regulations are expressly authorized by the legislature or recognized in a statutory scheme).

Further, nothing in 12 U.S.C. § 1455(e)(2) restricts a state's ability to enforce such laws. Thus, Colorado's enforcement of section 24–75–601.1 by holding violators liable does not create a conflict under the FHLMCA.

## III. Implied Damages Remedy

■ The parties next dispute whether section 24–75–601.1(1.5) creates an implied damages remedy, although it does not expressly provide that a public entity may seek damages when a firm refuses to repurchase a financial instrument after a demand has been made, and if so, how to measure those damages. We conclude that it does not.

■ Whether a statute impliedly creates a remedy is a question of legislative intent. *Gerrity Oil & Gas Corp. v. Magness,* 946 P.2d 913, 923 (Colo.1997) ("[W]e will not infer a private right of action based on a statutory violation unless we discern a clear legislative intent to create such a cause of action."). To determine such intent, a court must consider three factors:

> [W]hether the plaintiff is within the class of persons intended to be benefitted by the legislative enactment; whether the legislature intended to create, albeit implicitly, a private right of action; and whether an implied civil remedy would be consistent with the purposes of the legislative scheme.

*Id.* (quoting *Allstate Ins. Co. v. Parfrey,* 830 P.2d 905, 911 (Colo.1992)).

But where a statute creates legal duties and provides a particular means of enforcement, the designated remedy is exclusive and courts are without authority to impose others. *Silverstein v. Sisters of Charity*, 38 Colo.App. 286, 288, 559 P.2d 716, 718 (1976). This rule applies although the remedy is solely administrative and even if it may not redress all reasonably foreseeable harm. *See Bd. of County Comm'rs v. Moreland*, 764 P.2d 812, 818–19 (Colo.1988) (where remedies other than private damages are specifically provided for in a statute, "[t]his reflects that the state legislature ... gave thought to the issue of civil liability but made no provision for imposition of such liability...."); *Henderson v. Bear*, 968 P.2d 144, 147 (Colo. App.1998) (relying on *Breitwieser v. KMS Industries, Inc.*, 467 F.2d 1391 (5th Cir.1972), where the court declined to imply a private federal remedy in part "because the state provided [an express] ... remedy—albeit small").

The parties do not dispute that Jefferson County is within the class of intended beneficiaries under section 24–75–601.1. The county argues that we must imply a damages remedy for noncompliance with section 24–75–601.1(1.5) because such a remedy would encourage compliance with this section and further its purpose to protect the investments of public entities. However, even if the county's premises are valid, its conclusion fails because the legislature has expressly provided three remedies for violations of section 24–75–601.1.

● Under section 11–51–402, C.R.S.2010:

(4)(a) The securities commissioner *may by order revoke, suspend, or impose conditions upon exemptions available* ... if the securities commissioner finds that a broker-dealer or sales representative ... offered or sold, other than in an unsolicited transaction, to a public entity ... a financial instrument that such broker-dealer or sales representative knew or should have known does not qualify for sale to the public entity pursuant to section 24–75–601.1....

(Emphasis added.)

● Under section 11–51–410, C.R.S.2010:

(1) The securities commissioner *may by order deny an application for a license, suspend or revoke a license, censure a licensed person, limit or impose conditions on the securities activities that a licensed person may conduct in this state, and bar a person from association* with any licensed broker-dealer, investment adviser, or federal covered adviser in the conduct of its business in this state in such capacities and for such period as the order specifies .... if ... the licensed person ...:

(k) Has offered or sold to a public entity in the state of Colorado a financial instrument that such person knew or should have known does not qualify for sale to the public entity under section 24–75–601.1....

(Emphasis added.)

● Under section 24–75–601.5:

(1) Any person who sells or causes to be sold to a public entity any investment which is not a lawful investment for such public entity pursuant to section 24–75–601.1 or other authority, and who knew or should have known that said investment was not a lawful investment, shall be liable to such public entity for any loss of investment principal resulting from such investment and, in addition, shall be liable for any reasonably foreseeable costs resulting from such loss....

The repurchase obligation created by section 24–75–601.1(1.5) applies to "any financial instrument that fails to comply with the provisions of this section." Such noncompliance would also invoke the administrative remedies for selling an instrument "that does not qualify for sale to a public entity." Similarly, such an instrument would not be "a lawful investment," which is the trigger for liability under section 24–75–601.5.

These express remedies provided for a violation of section 24–75–601.1 indicate that the legislature considered remedies for violations of the statute. Further, according to a county treasurer, section 24–75–601.1(1.5) "provides that if somebody sells a ... public entity a security that is not qualified under Colorado law that they're required to buy it back. And in the event they don't, there are

some sanctions that can be imposed by the Securities Commission." Hearings on HB 1115 before the Sen. Finance Comm., 60th Gen. Assemb., 1st Sess. (May 2, 1995, 2:07 p.m.).

*Parfrey v. Allstate Ins. Co.*, 815 P.2d 959, 966 (Colo.App.1991), does not support Jefferson County's argument that we must imply a damages remedy to avoid frustrating the purpose of section 24–75–601.1(1.5) by effectively rendering compliance optional. In affirming *Parfrey*, the supreme court concluded that even though the legislature did not expressly provide a private remedy in section 10–4–609(2), failure to imply such a remedy would frustrate the statute's purposes. *Allstate Ins. Co. v. Parfrey*, 830 P.2d at 911. The court explained that no other relevant statutory provisions provided any "method for enforcing a violation" of the statute. *Id.* at 910 & n.3. In contrast, section 24–75–601.1 and the other provisions discussed above are not "totally silent on the matter of remedy." *Parfrey*, 830 P.2d at 910.

Nor are we persuaded by Jefferson County's assertion that absent an implied damages remedy, a seller could ignore a repurchase demand under section 24–75–601.1(1.5) and defend against both administrative sanctions and liability under section 24–75–601.5 by disputing whether it "knew or should have known" that the financial instrument was noncompliant. Where the legislature has provided a remedy, our inquiry into legislative intent ends without considering the adequacy of that remedy. *See Henderson*, 968 P.2d at 147 (where a state statute provides an express remedy, "[q]uestions as to the inadequacy of that remedy do not justify the creation of [an implied federal remedy]").

Accordingly, because the legislature provided express remedies for violations of section 24–75–601.1, we cannot imply one [6].

## IV. Disgorgement

Finally, Capital Securities contends the trial court erred by awarding disgorgement of its commissions to Jefferson County. We discern no basis for reversal, although our analysis differs from that of the trial court.

 Unlike damages, which provide compensation for the plaintiff's loss, restitution requires disgorgement of the defendant's gain, usually to prevent unjust enrichment. *See generally EarthInfo, Inc. v. Hydrosphere Res. Consultants, Inc.*, 900 P.2d 113, 118 (Colo.1995). Although disgorgement may be prescribed by statute, *see, e.g.*, § 11–51–602(2), C.R.S.2010 ("The securities commissioner may include in any action authorized by subsection (1) of this section ... a claim for damages under section 11–51–604 or restitution, disgorgement, or other equitable relief ...."), it is also available under common law equitable principles. *See EarthInfo, Inc.*, 900 P.2d at 118.

 An appellate court reviews a trial court's decision on equitable remedies for abuse of discretion. *See Wilson v. Prentiss*, 140 P.3d 288, 293 (Colo.App.2006). Whether the trial court has applied the correct legal standard to determine the availability of restitution is reviewed de novo. *See Redd Iron, Inc. v. Int'l Sales and Services Corp.*, 200 P.3d 1133, 1136 (Colo.App.2008).

### A.

We first reject Capital Securities' assertion that the disgorgement award must be set aside because the trial court awarded it under section 24–75–601.1(1.5). Although we have agreed with Capital Securities that section 24–75–601.1(1.5) does not provide a private damages remedy, we conclude that the trial court awarded disgorgement as a common law remedy.

Jefferson County's complaint included claims for both damages under section 24–75–601.1(1.5) (first claim) and restitution under the theory that "it would be unjust for [Capital Securities] to retain the commissions paid by the County" (third claim). In its final order the trial court said: "This Court awards [the county] damages on [its] first claim in the amount of $213,576.82, as described more fully in Section V below."

---

**6.** Having so concluded, we need not address the parties' contentions concerning what measure of damages should be applied to Capital Securities' refusal to repurchase the CMOs or the constitutionality of any particular measure.

However, Section V addressed the county's third claim and detailed the basis for the award. In that section, the court did not cite section 24–75–601.1(1.5).

Despite this inconsistency, we interpret the order as awarding the $213,576.82 on Jefferson County's restitution claim and not as damages under section 24–75–601.1(1.5). Our interpretation reflects both the complaint and the Trial Management Order, wherein the county sought restitution only on the third claim. *See In re Marriage of Thornhill*, 232 P.3d 782, 789 (Colo.2010) (reading contradictory findings in context); *People in Interest of D. C–M. S.*, 111 P.3d 559, 562 (Colo.App.2005) ("When an order is ambiguous, the reviewing court is charged with the task of determining what the trial court intended in issuing the order. In so doing, the court may refer to the entire record and to the circumstances surrounding the order.").

## B.

■ We next reject Capital Securities' argument that the trial court erred by awarding disgorgement to Jefferson County because section 24–75–601.5 provides the exclusive remedy for violations of section 24–75–601.1, and thus forecloses the common law equitable remedy of restitution.

Sections 24–75–601.1 and –601.5 do not expressly preclude a court from awarding equitable relief under common law. *See Bayer v. Crested Butte Mountain Resort, Inc.*, 960 P.2d 70, 78 (Colo.1998) (the creation of a statutory remedy does not bar preexisting common law rights of action in the absence of clear legislative intent to negate the common law right); *see also Kauntz v. HCA–Healthone, LLC*, 174 P.3d 813, 816–17 (Colo. App.2007) (quoting *Vigil v. Franklin*, 103 P.3d 322, 327 (Colo.2004)) ("[W]here the interaction of common law and statutory law is at issue, we acknowledge and respect the General Assembly's authority to modify or abrogate common law, but can only recognize such changes when they are clearly expressed.").

## C.

■ We also reject Capital Securities' argument that the trial court erred by awarding disgorgement on the sole basis that its commissions represented profit from an unlawful transaction. We agree that such a profit is not automatically subject to disgorgement. *See Remsen Partners, Ltd. v. Stephen A. Goldberg Co.*, 755 A.2d 412, 416 (D.C.2000) (disgorgement based on an illegal contract "should not follow automatically from a finding of illegality except where an applicable statute or regulation calls for such relief or it is justified by strong public policy principles"). But we disagree that the court ordered disgorgement solely on this basis.

■ A court may award restitution although the underlying contract was illegal. Restatement (Third) of Restitution & Unjust Enrichment § 32 (Tentative Draft No. 3, 2009) ("A person who renders performance under an agreement that is illegal ... may obtain restitution. . . .").

Some contracts are illegal because the subject involves a matter of moral turpitude, and in such cases restitution is usually denied. *See, e.g., United States v. Farrell*, 606 F.2d 1341, 1350 (D.C.Cir.1979) (restitution denied where claimant paid money to undercover police officer purporting to sell heroin); *Sinnar v. Le Roy*, 44 Wash.2d 728, 270 P.2d 800, 802 (1954) (restitution denied where claimant paid money to be used in bribing a third person). In such cases, courts generally afford no relief to either party. *See Crylon Steel Co. v. Globus*, 185 F.Supp. 757, 760 (S.D.N.Y.1960) ("[w]here ... a transaction is a fraud upon the public and is contrary to public policy ... the courts will leave the parties where it finds them").

According to the Restatement, however, the more frequent disputes concerning illegality:

> involve a claim for the value of services rendered in a transaction that is intrinsically unobjectionable, but that fails in some respect to comply with applicable regulatory requirements. Standard examples include the formation of a contract (otherwise legitimate) on terms that vary from those required by law; or the performance

of services by a provider who lacks a required license.

Restatement § 32 comment e; *see, e.g., Buccella v. Schuster*, 340 Mass. 323, 164 N.E.2d 141, 143 (1960) (blasting without a permit); *Thistle v. Englert*, 103 A.D.2d 268, 479 N.Y.S.2d 921 (N.Y.App.Div.1984) (unregistered motor vehicle repair shop).

Unlike the moral turpitude cases, restitution is generally available despite regulatory illegality, "unless the court concludes that the allowance of restitution would defeat the policy of the regulation in question." Restatement § 32 comment e ("the fact of noncompliance [with a regulatory requirement]—with rare exceptions—will not be evidence of the moral turpitude or inequitable conduct that forecloses a claim in restitution" to an unlicensed party that has performed its part of the bargain); *see Van Zanen v. Qwest Wireless, L.L.C.*, 522 F.3d 1127, 1131 (10th Cir.2008) (if an unlicensed party performed but was not paid, that party could have a claim in restitution for the benefit conferred).

Even where no such policy precludes restitution, however, it may not be available if both parties' performance in the underlying transaction has been completed. *See* Restatement § 32 comment f ("The law may at times refuse to aid a wrongdoer in getting that which good conscience permits him to receive; it will not for that reason aid another in taking away from him that which good conscience entitles him to retain." (quoting *Schank v. Schuchman*, 212 N.Y. 352, 106 N.E. 127, 129 (1914) (Cardozo, J.))). In a completed transaction, restitution is precluded if it will result in unjust enrichment to the claimant, who has received the full benefit of the illegal contract, or works a forfeiture because the defendant has fully performed. *Id.; Sutton v. Ohrbach*, 198 A.D.2d 144, 603 N.Y.S.2d 857, 857 (N.Y.App.Div. 1993) (claimant may not use licensing statutes "as a sword to recoup monies already paid in exchange for the purportedly unlicensed services" of architect).

Here, we treat a violation of section 24–75–601.1 as more like a regulatory illegality than a transaction deemed illegal based on moral turpitude. As discussed concerning preemption under part II(B) above, section 24–75–601.1 is not a broad prohibition on the sale of unrated securities. And it protects one party to the transaction—a public entity—rather than prohibiting both parties from engaging in specified conduct. *See Town Planning & Engineering Associates, Inc. v. Amesbury Specialty Co.*, 369 Mass. 737, 342 N.E.2d 706, 712 (1976) (citing 6A A. Corbin, *Contracts* § 1512, at 713 (1962)) ("The statute may be clearly for protection against fraud and incompetence; but in very many cases the statute breaker is neither fraudulent nor incompetent.").

Therefore, while restitution would not be proper on a per se basis, such an award would be within the discretion of the trial court. Here, the court's statement—"when a securities professional has profited from or received a commission for an unlawful transaction, that professional must disgorge the profit or commission"—might imply a per se award. But the court went on to balance certain equitable factors. Thus, we do not read the former statement as a per se award of restitution.

## D.

Finally, Capital Securities argues that the trial court applied the wrong standard in awarding restitution because it gave greater weight to the purpose of section 24–75–601.1—protecting the public against imprudent investment of public funds—than to the wrongdoing of Paschall. The trial court found that in soliciting the sale, Paschall had not only told Capital Securities that the CMOs "were lawful under the Section 601.1 Amendment," but had also provided documentation from several current and former public officials supporting his position.

We need not resolve this argument because we can uphold a correct result on any ground supported by the record, even if we do not accept the trial court's reasoning. *See, e.g., Sundheim v. Bd. of County Comm'rs*, 904 P.2d 1337, 1345 (Colo.App. 1995), *aff'd*, 926 P.2d 545 (Colo.1996). In the absence of a Colorado case that has addressed restitution in this context, we weigh

four factors derived from the Restatement § 32 to determine whether restitution was properly granted to Jefferson County in this completed transaction. *See Van Zanen*, 522 F.3d at 1132 (noting that "Colorado courts have repeatedly relied on the previous version of the Restatement of Restitution" and citing cases).

First, we consider whether the statute expressly mandates or precludes restitution. *See* Restatement § 32 comment a ("If a statute or regulation ... either confers a claim in restitution or precludes any claim for benefit conferred, there is no need to resort to the rules of this Restatement."). Here, section 24–75–601.1 does not address restitution.

Second, we consider whether restitution is precluded by any policy underlying the statute. *See* Restatement § 32 comment b (a court must compare "the policy against unjust enrichment, on the one hand, and the policy that prohibits the underlying transaction, on the other."). Here, allowing restitution does not defeat the purpose of section 24–75–601.1, which is "that public entities should be able to invest in securities that have minimal risk, yield a fair and equitable return, and may provide economic opportunities for Coloradans." Ch. 94, sec. 1, 2002 Colo. Sess. Laws 258; *see Swafford v. Harris*, 967 S.W.2d 319, 325 (Tenn.1998) (denying restitution based on a contingency fee contract for the expert services of a physician where it would "undermine and subvert strong public policies established to prohibit unprofessional conduct which affects the integrity of the judicial process and the administration of justice").

Third, we consider whether restitution would result in unjust enrichment to a claimant that has received the full benefit of the completed unlawful transaction. *See* Restatement § 32 comment f (if a prohibited transaction has been completed, regulatory illegality "will rarely serve as the basis of a claim to recover a payment previously made, because the allowance of the claim would create an unjust enrichment rather than reverse one"); *see Van Zanen*, 522 F.3d at 1131 (claimants were "not entitled to restitution" against an unlicensed insurance provider "because they have received

counterperformance—namely, the receipt of the insurance").

Here, restitution would not result in unjust enrichment to Jefferson County even though Capital Securities fully performed by obtaining the CMOs that Paschall had requested. Section 24–75–601.3 provides that a public entity must divest itself of noncomplying investments within six months of identifying them. Because the county divested itself of the CMOs that it had purchased at a discount, before they reached maturity, the county did not realize the full benefit of the transaction. Thus, unlike cases where the illegality does not impact the value of the benefit received, *see Comet Theatre Enterprises, Inc. v. Cartwright*, 195 F.2d 80, 83 (9th Cir.1952) (restitution denied when "there is no proof that the services ... were defective or that he in any other way did not receive value for the money which he paid"), the county ended up holding instruments that were subject to mandatory divestiture long before they matured. *See* 2 George E. Palmer, *Law of Restitution* § 8.3, at 185 (1978) (some courts order restitution "even though the agreed services were performed, which are perhaps best explained on the ground that the court did not regard the services as of any value").

Fourth, we consider whether restitution would result in a forfeiture by the party forced to disgorge. *See* Restatement § 32 comment f ("where the defendant's obligation has already been performed, it is the *allowance* of the claim in restitution (rather than its refusal) that will result in forfeiture, penalizing the defendant rather than the claimant"). Here, section 24–75–601.1(1.5) requires that a firm repurchase noncomplying securities "for the greater of the original purchase principal amount or the original face value." Although the statute does not define these measures, in most transactions such a repurchase would require the selling firm to repay any commission. Hence, we conclude that the statute precludes giving significant weight to a possible forfeiture because doing so would be at odds with the repurchase obligation. *Cf. Cooper v. Paris*, 413 So.2d 772, 774 (Fla.Dist.Ct.App.1982) ("[T]he statute prescribes punishment

against only one party to the agreement. . . . Therefore, to refuse to return the monies paid would affront this Court's affirmative duty to see that the party violating public policy not benefit in any way as a result of his wrongdoing.").

In sum, the first, second, and fourth factors listed above raise issues of statutory interpretation that we review de novo. *See Smith v. Executive Custom Homes, Inc.,* 230 P.3d 1186, 1189 (Colo.2010). The third factor involves undisputed facts, which we weigh independently. *Swieckowski v. City of Fort Collins,* 934 P.2d 1380, 1384 (Colo.1997) (where the underlying facts are undisputed, the issue becomes one of law, which we review de novo). Because these factors all support the restitution award, we can affirm without regard to the trial court's disregard of Paschall's conduct.[7]

Accordingly, we conclude that the trial court did not err in awarding Jefferson County restitution based on disgorgement of Capital Securities' commissions from sale of the CMOs.

The judgment is affirmed.

Judge MILLER and Judge BOORAS concur.

---

**7.** We decline to address the doctrine of *in pari delicto* because Capital Securities did not raise it. *See Van Zanen,* 522 F.3d at 1133 ("[T]he rationale for not allowing recovery of money paid to an unlicensed defendant who has performed as promised is not that the plaintiff and the unlicensed defendant are *in pari delicto.* Rather, it is that the defendant has not been unjustly enriched.").