2012 CO 39

**CAPITAL SECURITIES OF AMERICA, INC.; Jerry Manning; and Adam Alves, Petitioners**

v.

**Faye GRIFFIN, in her official capacity as Treasurer of Jefferson County, and Board of County Commissioners of the County of Jefferson, Respondents.**

No. 10SC779.

Supreme Court of Colorado, En Banc.

May 29, 2012.

Rehearing Denied June 18, 2012.

Snell & Wilmer L.L.P., Scott C. Sandberg, Jessica E. Yates, Denver, Colorado, Attorneys for Petitioners.

Ellen G. Wakeman, Jefferson County Attorney, Patricia Gilbert, Assistant County Attorney, Eric T. Butler, Assistant County Attorney, James L. Burgess, Assistant County Attorney, Golden, Colorado, Attorneys for Respondents.

Justice EID delivered the Opinion of the Court.

¶1 In 2006, Jefferson County purchased securities through Capital Securities, Inc., Jerry Manning, and Adam Alves (collectively, "Capital Securities"), a purchase the county later determined was unlawful under section 24–75–601.1, C.R.S. (2008). The county sued Capital Securities and, among other things, sought to disgorge the commissions earned by Capital Securities under a theory of common law restitution. Both the trial court and the court of appeals concluded that restitution was appropriate and ordered Capital

Securities to disgorge their commissions. We granted certiorari to examine whether restitution is an appropriate remedy in this context.

¶ 2 We now hold that it is not, and reverse the court of appeals. The statutory scheme adopted by the General Assembly expressly sets forth a number of remedies available to a public entity against a seller when—as occurred here—the public entity unlawfully purchases securities under section 24–75–601.1. These remedies include forcing the seller to repurchase the securities "for the greater of the original purchase principal amount or the original face value, plus any and all accrued interest, within one business day of the demand." § 24–75–601.1(1.5). In addition, any person who "sells or causes to be sold" the securities and "knew or should have known that [the securities were] not a lawful investment" shall be liable to the public entity for (1) "any loss of investment principal" and (2) "any reasonably foreseeable costs resulting from such loss." § 24–75–601.5, C.R.S. (2011). Further, the securities commissioner may, *inter alia,* suspend or revoke a seller's license or license exemption if he "knew or should have known" the securities were unlawful under section 24–75–601.1. § 11–51–410(1)(k), C.R.S. (2011); § 11–51–402(4)(a), C.R.S. (2011).

¶ 3 Significantly, while the legislature expressly provided a damages remedy (and specified how damages were to be calculated), an equitable remedy (repurchase), and a regulatory remedy (license revocation), it did not provide a disgorgement remedy under a theory of common law restitution. Under these circumstances, we conclude that the addition of disgorgement would impermissibly alter the extensive and detailed remedial scheme adopted by the legislature. We therefore conclude that, when a public entity purchases unlawful securities under section 24–75–601.1, disgorgement is not an available remedy against the seller.

**1.** CMOs are debt securities created from a pool of mortgages. Simplified, when mortgagors make their monthly payments of principal and interest on their loans, that amount accrues to the CMO, which in turn is paid out to the holder of the CMO.

## I.

¶ 4 In December 2006, Mark Paschall, the Jefferson County Treasurer, sought to purchase certain collateralized mortgage obligations ("CMOs") issued by the Federal Home Loan Mortgage Corporation ("Freddie Mac").[1] Under section 24–75–601.1(1)(b)(II), public entities were prohibited from purchasing any security issued by Freddie Mac not "rated in the highest rating category by two or more nationally recognized organizations that regularly rate such obligations,"[2] and the CMOs sought by Paschall were not rated. Paschall determined that although the CMOs were not formally rated, the market considered the CMOs as safe as formally rated securities, and therefore Jefferson County could purchase the CMOs. Paschall solicited the advice of others, and three government officials—the Deputy State Treasurer, the Adam's County Treasurer and Legislative Chair of the Colorado County Treasurer's Association, and a member of the Colorado House of Representatives who sponsored the statute—also concluded that Jefferson County could lawfully purchase the CMOs.

¶ 5 After coming to his conclusion, Paschall contacted Capital Securities and requested to purchase four of the CMOs. Paschall told Capital Securities that he believed Jefferson County could lawfully purchase the CMOs, and he provided Capital Securities the conclusions of the three governmental officials. Capital Securities sold the CMOs to Jefferson County for approximately $61,000,000 and received commissions for the sales totaling approximately $200,000.

¶ 6 In January 2007, Faye Griffin succeeded Paschall as the Jefferson County Treasurer. Shortly thereafter Griffin sent a letter to Capital Securities explaining that the county had determined it unlawfully purchased the CMOs and demanding that Capital Securities repurchase them. Capital Securities declined to repurchase the CMOs, stating that

**2.** This requirement has since been amended by the General Assembly. Concerning Investment of Public Funds, ch. 6, sec. 1, § 24–75–601.1, 2012 Colo. Sess. Laws 19.

they believed the CMOs were lawful public investments.

¶ 7 In June 2007, Griffin sent another demand-to-repurchase through the Colorado State Treasurer. Griffin demanded that Capital Securities repurchase the CMOs for the higher of original face value or original purchase price pursuant to section 24–75–601.1(1.5). Again, Capital Securities refused to repurchase the CMOs, but this time they offered to help the county sell the CMOs and agreed to waive any commissions for the sale. Refusing to accept Capital Securities' offer, the county filed this lawsuit.

¶ 8 In its initial complaint, the county sought equitable relief requiring Capital Securities to repurchase the CMOs under section 24–75–601.1(1.5). Instead of waiting for a court order, however, the county decided to sell the CMOs at a profit—including interest payments received, the county's profits exceeded $2,500,000.[3] After selling the CMOs, the county accordingly amended its complaint to request damages instead of a repurchase. Later, the county amended its complaint to also request disgorgement of the commissions paid to Capital Securities under a theory of common law restitution.

¶ 9 The trial court found Jefferson County unlawfully purchased the CMOs under section 24–75–601.1(1)(b)(II). The trial court reasoned that the plain language of the statute required the CMOs to be "rated in its highest rating category by two or more nationally recognized organizations that regularly rate such obligations," § 24–75–601.1(1)(b)(II), and these CMOs were not.

¶ 10 The trial court considered three types of damages. First, the court considered damages under section 24–75–601.1(1.5). Section 24–75–601.1(1.5) states that "[a]ny

firm that sells any financial instrument [that violates section 24–75–601.1] shall, upon demand of the public entity through the state treasurer, *repurchase such instruments* for the greater of the original purchase principal amount or the original face value, plus any and all accrued interest, within one business day of the demand." (Emphasis added). Because the county had sold the CMOs, it could not request that Capital Securities repurchase them. The trial court calculated that, using the statutory repurchase amount, damages in this case would exceed $52,000,000, even though the county made a profit.[4] Awarding $52,000,000 to the county, the trial court found, "would violate the Due Process Clause of the U.S. Constitution, which prohibits courts from imposing a grossly excessive punishment on the tortfeasor." Further, the CMOs were "neither risky nor volatile and [were] generally considered at least as safe as AAA–rated securities," and "[Capital Securities'] sale of these securities, while unlawful, was neither reprehensible, dangerous, nor particularly blameworthy." Thus the trial court awarded no damages.

¶ 11 Second, the court considered damages under section 24–75–601.5, which provides that "[a]ny person who sells ... to a public entity any investment which is not a lawful investment for such public entity pursuant to section 24–75–601.1 ..., and *who knew or should have known* that said investment was not a lawful investment, shall be liable to such public entity." (Emphasis added). The court found that Capital Securities lacked the requisite mental state—"knew or should have known"—and therefore did not violate section 24–75–601.5.

¶ 12 Third, and most important here, the court considered the county's claim for dis-

---

3. The trial court did not find the specific amount paid in interest, and instead only stated that the county "received interest payments." However, at oral argument, the county conceded that, with the profit it made on the sale of the CMOs, the county's total profits exceeded $2,500,000. It is unclear whether these profits account for the commission amount. In any event, the county made a substantial profit.

4. For CMOs, the original face value is based upon the value of the mortgages that make up the CMO. As the mortgagor pays off principal

and interest on her mortgage, the value of the CMO decreases. So when an investor purchases a CMO long after it was initially created, as Jefferson County did here, there is a large spread between the original face value and the purchase price. Here that spread represented over $52,000,000. Thus, awarding Jefferson County "the greater of the original purchase principal amount or the original face value" under the statutory language meant damages of over $52,000,000.

gorgement of commissions under common law restitution. The court concluded that "when a securities professional has profited from or received a commission for an unlawful transaction, that professional must disgorge the profit or commission." Even though disgorgement here was, "in one sense, ordering funds from one wrongdoer to another," the court awarded Jefferson County $213,576.82, plus interest, as disgorgement of the commissions paid to Capital Securities. Both sides appealed and the court of appeals affirmed.

¶ 13 First, the court of appeals held that section 24–75–601.1(1.5), which, as noted above, requires a firm to repurchase unlawful securities it sold to a public entity, does not provide an implied damages remedy. "[W]here a statute creates legal duties and provides a particular means of enforcement, the designated remedy is exclusive and courts are without authority to impose others." *Griffin v. Capital Sec. of Am.*, —— P.3d ——, ——, 2010 WL 4361378 (Colo.App. 2010). Similarly, "[w]here the legislature has provided a remedy, our inquiry into legislative intent ends without considering the adequacy of that remedy." *Id.* at ——. Since the county had previously sold the CMOs, section 24–75–601.1(1.5) provided no remedy.

¶ 14 Second, the court of appeals held that Capital Securities must disgorge their commissions to the county. The court stated that the statutory scheme did not "expressly preclude a court from awarding equitable relief under common law" and cited cases holding that the creation of a statutory claim does not bar preexisting common law claims. *Id.* at ——. It concluded that, indeed, Jefferson County was entitled to disgorgement under a theory of common law restitution and that Capital Securities should disgorge its commissions to the county. *Id.* at ——.[5] Capital Securities filed a petition for certiorari challenging the court of appeals' disgorge-

ment ruling, which we granted.[6] We now reverse the court of appeals, and hold that disgorgement is not an available remedy against a seller when a public entity purchases unlawful securities under section 24–75–601.1.

## II.

¶ 15 Section 24–75–601.1(1)(b)(II) prohibits public entities from purchasing "[a]ny security issued by … [Freddie Mac] … unless, at the time of purchase, the security is rated in its highest rating category by two or more nationally recognized organizations that regularly rate such obligations." When a public entity discovers it has unlawfully purchased securities under section 24–75–601.1, the public entity must sell the securities, § 24–75–601.3, C.R.S. (2011), and sellers are subject to statutory penalties.

¶ 16 Firms that sell the securities "shall, upon demand of the public entity through the state treasurer, repurchase such [securities] for the greater of the original purchase principal amount or the original face value, plus any and all accrued interest, within one business day of the demand." § 24–75–601.1(1.5). In addition, any person who "sells or causes to be sold" the securities and "knew or should have known that [the securities were] not a lawful investment" shall be liable to the public entity for (1) "any loss of investment principal" and (2) "any reasonably foreseeable costs resulting from such loss." § 24–75–601.5.

¶ 17 Further, for those broker-dealers and sales representatives who are licensed to sell securities, the securities commissioner may, *inter alia*, suspend or revoke their license if they "knew or should have known" the securities were unlawful under section 24–75–601.1. § 11–51–410(1)(k). Similarly, for those broker-dealers and sales representatives exempt from licensure, the securities commissioner may revoke, suspend, or impose condi-

---

5. The trial court was unclear whether its order for disgorgement was authorized under the common law or under section 24–75–601.1(1.5). The court of appeals, however, determined that the trial court's order was based on the common law rather than the statute. *Griffin*, —— P.3d at ——.

6. We granted certiorari on the following issue:

When a court finds a transaction unlawful but also finds that a defendant's conduct was not blameworthy and that the plaintiff had no out-of-pocket losses, can the court nonetheless order disgorgement of defendant's profits on the theory that disgorgement is proper as long as the plaintiff is not unjustly enriched?

tions upon their exempt status if they sell, "other than in an unsolicited transaction," securities they "knew or should have known" were unlawful under section 24–75–601.1. § 11–51–402(4)(a).

¶ 18 The court of appeals found that the statutory scheme "do[es] not expressly preclude a court from awarding equitable relief under common law," namely, disgorgement under a theory of restitution. *Griffin,* —— P.3d at ——. The court then held restitution to be an appropriate remedy. *Id.* at ——. We disagree.

■ ¶ 19 When deciding whether a statutory scheme allows remedies not expressly set forth in the statute, "the ultimate issue is one of legislative intent." *Bd. of Cnty. Comm'rs v. Moreland,* 764 P.2d 812, 820 (Colo.1988).[7] In *Moreland,* we addressed whether an individual could bring a negligence claim against a county for failure to enforce its building code. 764 P.2d at 812–13. The building code allowed the county to impose sanctions against private parties, but did not explicitly allow private parties to sue the county. *Id.* at 813. We ultimately concluded that neither the county nor the General Assembly, which had authorized counties to enact the code, intended to grant private parties a common law remedy against the county. *Id.* at 821.

■ ¶ 20 In determining the legislative intent, we put substantial weight on the fact that the legislature had failed to expressly provide the remedy. We concluded that when the General Assembly imposes statutory duties on governments "unknown at common law," the General Assembly must provide a "clear expression of legislative intent" to impose a remedy for civil damages. *Id.* at 818.[8] The building code's failure to expressly provide a remedy for civil damages "foreclose[d] us from recognizing such a remedy." *Id.* at 819.

¶ 21 We noted that "similar considerations are relevant but to a lesser degree" when considering whether "civil liability can be imposed upon nongovernmental defendants," *id.* at 820, and we supported our holding with cases from this court and the court of appeals involving nongovernmental defendants, *id.* at 819–20. In those cases, a statute created duties and provided specific remedies, thus precluding additional common law remedies. *Id.* at 819–20; *see, e.g., Bd. of Cnty. Comm'rs v. Pfeifer,* 190 Colo. 275, 280, 546 P.2d 946, 949 (1976) ("[I]n this case the [General Assembly] has clearly and expressly established the remedies available to the Board in order to enforce its subdivision requirements, and they are so limited."); *Silverstein v. Sisters of Charity,* 38 Colo.App. 286, 288–89, 559 P.2d 716, 718 (1976) (The General Assembly could have authorized civil penalties for violations of the act, but "it chose to impose only a criminal sanction. Therefore, we have no authority to impose civil liability."). We further supported our conclusion by noting that "the [General Assembly] and the [county] board gave thought to the issue of civil liability but made no provision for imposition of such liability against the [c]ounty." *Moreland,* 764 P.2d at 818–19.

■ ¶ 22 We find our analysis in *Moreland* instructive in this case. Here, as in *Moreland,* we conclude that the General Assembly carefully considered the issue of what remedies should be available against a seller when a public entity unlawfully purchases securities under section 24–75–601.1. As noted above, a public entity that has purchased unlawful securities can force the seller to repurchase the securities at the "original purchase principal amount or the original face value, plus any and all accrued interest, within one business day of the demand." § 24–75–601.1(1.5). Further, the entity may seek damages from any person who sold the securities and "knew or should have known" the sale was unlawful. § 24–75–601.5. Dam-

---

7. We note that the analysis is similar, but distinct, in cases where a statute contains no remedies and we must determine whether the statute allows a party to bring an action at all. *See Allstate Ins. Co. v. Parfrey,* 830 P.2d 905, 910–11 (Colo.1992); *see also Moreland,* 764 P.2d at 820 n. 13 (noting the different line of cases).

8. In *State v. Moldovan,* we described this statement as applying to regulatory duties imposed on governments. 842 P.2d 220, 228 (Colo.1992). We read *Moldovan*'s description of *Moreland* as simply stating that the ultimate inquiry is into the General Assembly's intent.

ages are further specified as "any loss of investment principal" together with "any reasonably foreseeable costs resulting from such loss." *Id.* In addition, the legislature granted the securities commissioner the authority to take action against any seller who "knew or should have known" the securities were unlawful under section 24–75–601.1, including license revocation, § 11–51–410(1)(k), or alteration of the person's license-exempt status, § 11–51–402(4)(a).

¶ 23 It is significant that, in considering what remedies should be available when a public entity purchases unlawful securities under section 24–75–601.1, the General Assembly considered the availability of damages (and specified how damages were to be calculated), the availability of equitable remedies (and specified repurchase), and the availability of regulatory remedies (and specified license revocation). Yet the General Assembly did not provide a disgorgement remedy under a theory of common law restitution. Under these circumstances, we conclude that the addition of disgorgement would impermissibly alter the extensive and detailed remedial scheme adopted by the General Assembly. We therefore hold that disgorgement is not an available remedy against a seller when a public entity purchases unlawful securities under section 24–75–601.1. *See Transamerica Mortg. Advisors, Inc. v. Lewis,* 444 U.S. 11, 19, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979) ("[I]t is an elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it.").

¶ 24 The court of appeals arrived at a different conclusion, relying on a canon of statutory construction that applies when common law claims *preexist* the statute. *Griffin,* —— P.3d at —— (citing *Vigil v. Franklin,* 103 P.3d 322, 327 (Colo.2004); *Bayer v. Crested Butte Mountain Resort, Inc.,* 960 P.2d 70, 78 (Colo.1998)). That canon of construction requires a statute to express a "clear legislative intent to negate the [preexisting] common law right." *Bayer,* 960 P.2d at 78. In reliance on this canon, the court of appeals found that the statutory scheme here must "expressly preclude" resti-

tution, *Griffin,* —— P.3d at ——, which it does not do.

¶ 25 But here there was no preexisting common law claim. Before the General Assembly enacted section 24–75–601.1, Capital Securities had no obligation to refrain from selling unrated CMOs to public entities; it is this section that makes such securities "unlawful." Thus, in this case, the legislature simultaneously defined by statute what particular conduct is prohibited and what particular remedies are available when such prohibited conduct occurs. It did not alter a common law claim that previously existed.

¶ 26 Contrary to the court of appeals' conclusion, then, the statutory scheme here need not "expressly preclude" restitution. It is enough that the remedy was not included in the panoply of remedies specified for the newly-prohibited conduct. *Cf. Moreland,* 764 P.2d at 818 (finding it significant in determining the available remedies that the General Assembly had imposed a statutory duty on government "unknown at common law").

¶ 27 The court of appeals also relied on section 32 of the Restatement of the Law (Third) Restitution and Unjust Enrichment (2011) (the "Restatement"), which we also find inapplicable. Restatement section 32 permits a "person who renders performance under an agreement that is illegal" to obtain restitution from the recipient when (1) "restitution is required by the policy of the underlying [law]" or (2) "as necessary to prevent unjust enrichment, if the allowance of restitution will not defeat or frustrate the policy of the underlying [law]." But where, as here, we find the General Assembly's intent was to preclude restitution as a remedy, no further investigation into the "policy" of the statute is necessary or appropriate. *See, e.g.,* Restatement § 32 cmt. a ("If a statute or regulation governing a particular case either confers a claim in restitution, or precludes any claim for benefits conferred, the question is settled accordingly.").

¶ 28 In sum, we hold that disgorgement is not an available remedy against the seller when a public entity unlawfully purchases securities under section 24–75–601.1. Because we find that disgorgement is not an available

remedy, we need not address whether disgorgement was appropriate under the particular circumstances of this case.

## III.

¶ 29 For the reasons set forth above, we reverse the court of appeals and remand the case for further proceedings consistent with this opinion.

Justice MÁRQUEZ and Justice BOATRIGHT do not participate.